749 A.2d 174

**Lisa JACOBS & Sheila Jacobs, Personal Representatives of the Estate of Leo M. Jacobs**

**v.**

**Meade FLYNN, et al.**

**No. 5893, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Feb. 25, 2000.

Reconsideration Granted in Part, Denied in Part May 1, 2000.

344

348

Randell C. Ogg (Matthew P. Maloney and Sherman, Meehan, Curtin & Ain, P.C., on the brief), Washington, DC, for appellants.

Michael K. Wiggins (Andrew E. Vernick and Wharton, Levin, Ehrmantraut, Klein & Nash, on the brief), Annapolis, for appellee, Flynn.

Gary R. Jones (Thomas F. Corcoran and Baxter, Baker, Sidle & Conn, P.A., on the brief), Baltimore, for appellee, Howard County General.

Craig B. Merkle (Goodell, DeVries, Leech & Gray, LLP, on the brief), Baltimore, for appellee, McCormack.

Donna P. Sturtz (Steven F. Barley and Miles & Stockbridge, P.C., on the brief), Baltimore, for appellees, Kishel, M.D., Applestein, M.D., MacLean, M.D., etc.

Argued before WENNER, ADKINS and JAMES T. SMITH, Jr. (Specially Assigned), JJ.

ADKINS, Judge.

This medical malpractice case revolves around the events that led to the paralysis of Leo M. Jacobs,[1] appellant/cross appellee. Mr. Jacobs brought a negligence suit against: appellees/cross appellants, Dr. Thomas MacLean, MacLean, Applestein & Kishel, M.D., P.A.; appellees, Drs. John Kishel, Marc Applestein, Meade Flynn, Gregory McCormack, and Howard County General Hospital ("HCGH"); and Dr. Jerry Seals.[2] Dr. Seals settled the claim against him before trial and a trial by jury proceeded against the remaining defendants. The jury returned a verdict in favor of Mr. Jacobs against Dr. MacLean, MacLean, Applestein & Kishel, M.D., P.A. and Dr. Flynn only, and awarded Mr. Jacobs $1,240,000. The trial judge later directed a verdict in favor of Dr. Flynn based on the applicable statute of limitations and reduced the judgment against Dr. MacLean to $620,000 based on the settlement with Dr. Seals and the application of the Maryland Contribution Among Joint Tort–Feasors Act. Both Mr. Jacobs and Dr. MacLean have raised a number of issues on appeal:

I. Whether the trial court erred in denying motion for judgment and motion for judgment not withstanding the verdict filed by Dr. MacLean and MacLean, Applestein & Kishel, M.D., P.A.?

II. Whether the trial court erred in ruling, as a matter of law, that Mr. Jacobs's claim against Dr. Flynn was barred by the statute of limitations?

III. Whether the trial court erred in reducing the judgment against Dr. MacLean by one half pursuant to the Maryland Contribution Among Joint Tort–Feasors Act?

---

**1.** Mr. Jacobs died in December 1998. This appeal has been maintained by his daughters, Lisa and Sheila Jacobs as personal representatives of his estate. For convenience, we shall refer to Mr. Jacobs as the appellant.

**2.** This case was originally filed in the Circuit Court for Prince George's County but was transferred pursuant to a motion for change of venue to the Circuit Court for Howard County.

IV. Whether the trial court erred by refusing to admit certain medical records?

V. Whether the trial court erroneously instructed the jury on apparent agency?

## FACTS

Mr. Jacobs had been deaf and mute since birth. Despite his disability, he had an active lifestyle and worked for the deaf community. In February of 1991, Mr. Jacobs was vacationing in California. When he arrived in California, he began to experience severe back pain and a fever. On February 2, Mr. Jacobs checked into Washington Hospital in Freemont, California. He was hospitalized for approximately nine days in California and treated for back pain and fever. While in the hospital, Mr. Jacobs received treatment from Dr. Ahmed Sadiq, a specialist in oncology, and Dr. Muni Barash, a specialist in infectious diseases. Mr. Jacobs testified that he told these doctors that he was experiencing pain in the middle of his back. These doctors told Mr. Jacobs that his back pain was caused by metastatic prostate cancer. After being discharged from the hospital on February 11, Mr. Jacobs remained in California and continued to receive treatment for his back pain from various health care providers. Mr. Jacobs returned to his home in Laurel, Maryland, on February 22, 1991.

On February 25, 1991, Mr. Jacobs went to see Dr. MacLean. Dr. MacLean was a urologist who had previously treated Mr. Jacobs for prostate related problems. Dr. MacLean immediately admitted Mr. Jacobs to HCGH in order to evaluate the cancer diagnosis. That day, Dr. MacLean ordered a blood test and a lumbosacral (lower back) spine x-ray. Dr. MacLean testified that he did not order an x-ray for the middle of Mr. Jacobs's back because Mr. Jacobs did not inform him that he was experiencing pain in that region.

Dr. MacLean testified that he had to leave town on February 26 for personal reasons. At this point, Dr. MacLean

turned over Mr. Jacobs's case to his partners, Drs. Applestein and Kishel, both urologists.

Dr. Applestein testified that he began treating Mr. Jacobs on February 27 and that he called Dr. Sadiq in California and Dr. Sadiq told him that he believed that Mr. Jacobs did not have cancer. At this point, Dr. Applestein believed that Mr. Jacobs's back pain might be caused by an infection rather than cancer. Accordingly, Dr. Applestein called Dr. Seals, an infectious disease specialist. Dr. Seals ordered that a number of tests be done on Mr. Jacobs, including a bone scan, in order to investigate the probability of osteomyelitis, "which can also give birth to the epidural abscess." At the same time, Drs. Applestein and Kishel, who examined Mr. Jacobs on February 28, continued to investigate possible urological causes for Mr. Jacobs's pain.

By March 2, 1991, based on various tests, Drs. Applestein and Kishel ruled out urological causes for the back pain. Dr. Flynn interpreted the bone scan as normal. At this point, Dr. Seals continued his treatment of Mr. Jacobs and called in a rheumatologist,[3] Dr. McCormack, to investigate whether Mr. Jacobs's pain was caused by a more chronic problem.

Dr. MacLean again became involved with Mr. Jacobs's care on March 4, 1991. At Dr. McCormack's suggestion, Dr. MacLean ordered an MRI scan of Mr. Jacobs's lower back. The MRI was not ordered on a "stat" basis. As a result, the MRI scan was not performed until March 6 and no doctor inquired as to the MRI results until March 7.

Mr. Jacobs's condition worsened on March 5. On March 7, when Mr. Jacobs reported problems with leg weakness, Drs. McCormack and Seals ordered a neurological consult. Subsequently, Mr. Jacobs was transferred to the University of Maryland Hospital. At the University of Maryland Hospital, Mr. Jacobs was diagnosed with an epidural abscess, a pocket

---

3. Dr. McCormack testified that his practice as a rheumatologist entails the diagnosis and treatment of muscular and skeletal joints, as well as diagnosis and treatment of some connective tissue diseases.

of pus or inflammation outside of the spinal cord. The infection from the abscess caused Mr. Jacobs to become permanently paralyzed from the mid-waist level down. Mr. Jacobs required hospitalization for five months and then spent another seventeen months in an assisted living environment. He died from apparently unrelated causes in December 1998.

## DISCUSSION

### I.

### The trial court properly denied Dr. MacLean's motion for judgment and judgment not withstanding the verdict.

A party is entitled to a judgment not withstanding the verdict (JNOV) when the evidence at the close of the case, taken in the light most favorable to the nonmoving party, does not legally support the nonmoving party's claim or defense. *See Bartholomee v. Casey,* 103 Md.App. 34, 51, 651 A.2d 908 (1994), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995). In reviewing the denial of a JNOV, we " 'must resolve all conflicts in the evidence in favor of the plaintiff and must assume the truth of all evidence and inferences as may naturally and legitimately be deduced therefrom which tend to support the plaintiff's right to recover....' " *Houston v. Safeway Stores, Inc.,* 346 Md. 503, 521, 697 A.2d 851 (1997) (quoting *Smith v. Bernfeld,* 226 Md. 400, 405, 174 A.2d 53 (1961)). If the record discloses any legally relevant and competent evidence, however slight, from which the jury could rationally find as it did, we must affirm the denial of the motion. *See Franklin v. Gupta,* 81 Md.App. 345, 354, 567 A.2d 524, *cert. denied,* 319 Md. 303, 572 A.2d 182 (1990). If the evidence, however, does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty, then the denial of the JNOV was error. *See Bartholomee,* 103 Md.App. at 51, 651 A.2d 908. Nevertheless, "[o]nly where reasonable minds cannot differ in the conclusions to be drawn from the evidence, after it has been viewed in the light most favorable to the plaintiff, does the issue in question become

one of law for the court and not of fact for the jury." *Pickett v. Haislip*, 73 Md.App. 89, 98, 533 A.2d 287 (1987), *cert. denied*, 311 Md. 719, 537 A.2d 273 (1988).

Dr. MacLean contends that the trial court erred in denying his motion for judgment and JNOV because the evidence presented at trial was not legally sufficient to establish that his negligence was the proximate cause of Mr. Jacobs's paraplegia. Specifically, Dr. MacLean asserts that the testimony of the plaintiff's expert witnesses, Drs. David Andrews and Jack Kaufman, and the testimony of the opposition's expert witness, Dr. Bruce Ammerman, did not establish to a reasonable degree of medical probability that different conduct by Dr. MacLean would have prevented Mr. Jacobs's paraplegia.

In order to establish a *prima facie* case of medical negligence, a plaintiff must establish: (1) the applicable standard of care; (2) that this standard has been violated; and (3) that this violation caused the complained of harm. *See Weimer v. Hetrick*, 309 Md. 536, 553, 525 A.2d 643 (1987) (quoting *Waffen v. U.S. Dep't of Health & Human Servs.*, 799 F.2d 911, 915 (4 th Cir.1986)).

As with other cases, in order to prove causation, a medical malpractice plaintiff must establish that but for the negligence of the defendant, the injury would not have occurred. *See Suburban Hosp. Ass'n, Inc. v. Mewhinney*, 230 Md. 480, 484–85, 187 A.2d 671 (1963). Because of the complex nature of medical malpractice cases, expert testimony is normally required to establish breach of the standard of care and causation. *See Meda v. Brown*, 318 Md. 418, 428, 569 A.2d 202 (1990). Generally, we have required expert opinions to be established within a reasonable degree of probability. *See Karl v. Davis*, 100 Md.App. 42, 51–52, 639 A.2d 214, *cert. denied*, 336 Md. 224, 647 A.2d 444 (1994).

Nevertheless, decisions by the Court of Appeals have held that the expert testimony itself need not establish a probable causal relationship. As the Court has previously explained:

The law requires proof of probable, not merely possible, facts, including causal relations.... But, sequence of events, plus proof of *possible* causal relation, may amount to proof of *probable* causal relation, in the absence of evidence of any other equally probable cause.

*Charlton Bros. Transp. Co., Inc. v. Garrettson,* 188 Md. 85, 94, 51 A.2d 642 (1947) (emphasis in original). For example, in *Hughes v. Carter,* 236 Md. 484, 204 A.2d 566 (1964), the plaintiff claimed that she suffered pneumonia as a result of an automobile accident. Her attending physician testified that pneumonia "was sometimes caused by a patient being confined to bed, and sometimes it followed a compression-type injury to the chest[,]" and that the plaintiff had suffered such an injury. *Id.* at 486, 204 A.2d 566. The physician also testified that the plaintiff showed no signs of pneumonia when she was treated on the night of the accident. When, however, asked whether the accident caused the pneumonia, he "[f]irst said it was possible, then that it was probable, and finally that he would not 'pin it down.'" *Id.* The Court held that there was sufficient evidence of a causal connection to submit the question of causation to the jury. *See id.*

Relying on these decisions, we stated in *Karl* that an expert's testimony to a reasonable degree of probability is not always essential to prove causation; rather, a plaintiff's burden of proof will be satisfied by expert testimony "with respect to causation as to what is possible if, in conjunction with that testimony, there is additional evidence of causation introduced at trial that allows the finder of fact to determine that issue." *Karl,* 100 Md.App. at 52, 639 A.2d 214. Therefore, our inquiry on appeal is whether, based on the entire record, a reasonable jury could have found that the negligence of Dr. MacLean was a proximate cause of Mr. Jacobs's paraplegia.

Reasonable "[p]robability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur)." *Cooper v. Hartman,* 311 Md. 259, 270, 533 A.2d 1294 (1987)

(quoting *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 666, 464 A.2d 1020 (1983)) (emphasis omitted). For example, in *Franklin* an expert testified about five instances where the standard of care was breached and testified that the patient's condition would have been less likely to occur absent the breach. *See Franklin*, 81 Md.App. at 361, 567 A.2d 524. We held that this testimony satisfied the causation element. "[The expert concluded] 'the events would have not occurred, or would have been less likely to have occurred. . . .' We find that sufficient." *Id.*

Likewise, in *Meda*, the plaintiff claimed that her arm was injured because it was improperly secured while she was under anesthesia during an operation. *See Meda*, 318 Md. at 425–26, 569 A.2d 202. The expert in *Meda* could not testify exactly how the arm was injured, but rather, relied on circumstantial evidence in forming his opinion. The Court of Appeals found this testimony sufficient to reverse the trial court's grant of a JNOV because "the facts had support in the record, and the reasoning employed was based upon logic rather than speculation or conjecture." *Id.* at 428, 569 A.2d 202.

Both Mr. Jacobs and Dr. MacLean presented expert witnesses to testify regarding causation and the probability that Mr. Jacobs's condition could have been prevented. A major focus of the testimony of these experts was on the question of whether Mr. Jacobs's condition could have been prevented by surgery.

Dr. David Andrews, a neurosurgeon, testified on behalf of Mr. Jacobs regarding causation. He stated that "in most cases [involving an epidural abscess] surgery is indicated." He explained:

Only in instances where patients are neurologically intact would we consider watching them medically, *i.e.* just treating them with antibiotics and examining them carefully over time. . . . The most compelling picture [for surgery] is one in which a patient has a documented epidural abscess, is on the appropriate antibiotics and starts losing neurological function. That's a situation in which neurosurgeons would

then intervene and operate on the spine to open up the canal, debride the area, obtain specimens to make sure you have the appropriate antibiotic coverage. . . .

Dr. Andrews testified that Mr. Jacobs was a candidate for treatment by a neurosurgeon at HCGH.

The following exchange also took place between Dr. Andrews and Mr. Jacobs's counsel:

[COUNSEL]: Do you have an opinion to a reasonable degree of professional probability as to whether or not Mr. Jacobs'[s] paraplegia could have been prevented or would have been prevented had Mr. Jacobs been referred to a neurosurgery unit such as yourself by March 1, 1991?

[DR. ANDREWS]: He could have been paralyzed under any circumstance. The best chance of neurologic recovery or maintenance of normal neurological function however would have probably . . . been with neurological intervention.

[COUNSEL]: Were there any indications in Mr. Jacobs'[s] course from [March 1] on that would have indicated to a neurosurgeon that he was a candidate for either surgical intervention or some other therapy?

[DR. ANDREWS]: Yes.

Dr. Andrews testified that MRI exams taken on Mr. Jacobs's back after the March 8 myelogram showed spinal cord compression.

Dr. MacLean's expert witness, Dr. Ammerman, opined that Dr. MacLean's negligence was not the proximate cause of Mr. Jacobs's paraplegia because Mr. Jacobs never had compression in his spinal cord. "Cord compression," he said, was "pressure on the spinal cord," "as though I were to take my hands and put them around somebody's neck and squeeze." Dr. Ammerman opined that only patients who have an epidural abscess caused by cord compression are viable surgical candidates. He explained, however, that cord compression is the most common way in which an epidural abscess causes damage to the spinal cord:

The most common is that there is compression on the spinal cord itself. . . . [T]hat compression, that pressure causes a lack of blood flow to the spinal cord and the spinal cord has a stroke and the patient becomes paralyzed. . . . In some patients they don't have compression. The inflammation is enough in this group to cause the blood vessels to become inflamed and to block up, to stop working.

During cross-examination, Dr. Ammerman acknowledged that if Mr. Jacobs had a spinal cord compression, he would have been a viable surgical candidate, and surgery should have been performed immediately. Although Dr. Ammerman testified that a myelography [4] performed on Mr. Jacobs on March 8, 1991, showed no signs of cord compression, he reluctantly admitted that an MRI performed on March 7, 1991, showed Mr. Jacobs had spinal cord compression:

[Counsel]: Now did the MRI that you looked at on March the 7th, 1991 show evidence of cord compression?

\* \* \*

[Dr. Ammerman]: It's described as showing displacement of the cord posteriorly. . . .

[Counsel]: Well, that's cord compression, correct?

[Dr. Ammerman]: That's what they're describing in this report, correct.

[Counsel]: So as of March 7th, 1991 the MRI does show evidence of cord compression, correct?

[Dr. Ammerman]: The person who described this, does. As it turns out on the myelogram, which I have reviewed, which is the gold standard, the film was over read, because there is no cord compression.

 In light of the agreement by Dr. Andrews and Dr. Ammerman that Mr. Jacobs was a viable candidate for surgery if he had cord compression in his spine, we think it reasonable for the jury to infer that Dr. MacLean's failure to

---

4. A myelogram is a type of x-ray test.

refer Mr. Jacobs to a neurologist had a causal relation to his paralysis. Dr. MacLean's expert, Dr. Ammerman, acknowledged that the most common type of epidural abscess is that caused by a cord compression. He further agreed that surgery should be performed immediately when it is discovered that a patient suffers from spinal cord compression. The MRIs done on March 7 and after showing cord compression provided the jury with evidence that Mr. Jacobs did, in fact have cord compression. As we indicated, the expert testimony itself need not establish the probable cause relationship, and the jury may rely on other circumstances. See *Charlton, Bros.*, 188 Md. at 94, 51 A.2d 642. While Dr. Ammerman challenged the significance of the MRI showing that there was cord compression, the jury was free to disregard his testimony, and conclude that Mr. Jacobs suffered from cord compression. If the jury concluded that cord compression was present, its conclusion that Mr. Jacobs's paraplegia probably would have been prevented, absent Dr. MacLean's negligence, is supported by the testimony of both experts and the evidence offered at trial. Although none of the doctors who testified could state to a medical certainty that Mr. Jacobs would not have been paralyzed if he was immediately referred to a neurosurgeon, the test is one of reasonable probability. *See Karl*, 100 Md.App. at 51–52, 639 A.2d 214.

The evidence regarding causation was not limited to the curative effect of surgery. There was also expert testimony that Mr. Jacobs would not have been paralyzed if he had received appropriate antibiotic therapy throughout the course of his treatment. On cross-examination, Dr. Ammerman testified that when a patient has an epidural abscess, but no spinal cord block, the patient should be treated with antibiotics and "many times ... that's the end of it[,][t]he patient does not become paraplegic." Additionally, Dr. Andrews testified that Mr. Jacobs was a candidate for antibiotic therapy and explained how the treatment should be properly initiated and monitored. Moreover, Dr. Jack Kaufman, an internist, who testified as an expert witness regarding the standard of care, stated that antibiotic treatment "will usually work." The jury

could have reasonably concluded that the failure to give proper antibiotic treatment caused Mr. Jacobs's paralysis.

Accordingly, the trial court did not err in denying the motion for JNOV.

## II.

### The trial court did not err by ruling as a matter of law that Mr. Jacobs's action against Dr. Flynn was barred by the statute of limitations.

Mr. Jacobs's claim against Dr. Flynn is based on the theory that Dr. Flynn negligently reported the bone scan given to Mr. Jacobs on March 2, 1991, as "normal," when the bone scan showed the presence of an epidural abscess. Dr. Flynn was not a defendant in the initial suit and was not added as a defendant until May 8, 1995. Dr. Flynn moved for summary judgment in both the Health Claims Arbitration Office ("HCAO") and the circuit court based on the statute of limitations.

At the close of the evidence in the circuit court, the trial judge granted judgment in favor of Dr. Flynn, holding that Mr. Jacobs's claim was barred by the statute of limitations. The court explained:

> I believe that the Plaintiff's claim against Dr. Flynn is barred by the limitations.... I believe the Plaintiff has to within the statute, within three years, has to have discovered his injury. I don't believe that he need[s] to know the mechanics of his injury. I don't even know that he need[s] to know with specificity who caused his injury. The evidence in this case is, that in the spring of '91, he realized that he was paralyzed and that it was the product of negligence. I think he then was put on notice, go out and muster your case, drum up a case against whoever you think caused your injuries.... [I]n the spring of '91, the Plaintiff, his two daughters, realized that, or had reason to believe, well specifically, that he had been injured likely as the result of negligence on parts of physicians associated with likely his hospitalization in Howard County.... [N]o

reasoning juror as I see it could conclude that in the spring of '91 he wasn't aware of his injury.... [A]nd that's the issue.

Mr. Jacobs argues that the trial court erred by treating the date Mr. Jacobs discovered he was injured as the accrual of his cause of action. He asserts that: (1) the limitations period did not begin to run until he was on notice of his claim against Dr. Flynn; and (2) reasonable minds could differ as to whether Mr. Jacobs, in the exercise of due care and diligence, would have discovered his claims against Dr. Flynn by May 8, 1992. We disagree with Mr. Jacobs and affirm the judgment in favor of Dr. Flynn on the limitations ground.

 A trial court should grant a motion for summary judgment only when the movant clearly demonstrates the absence of any genuine issue of material fact and demonstrates that it is entitled to judgment as a matter of law. *See Beatty v. Trailmaster Prods. Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993). In determining whether the grant of a motion for summary judgment is appropriate, the "reviewing court [should] resolve all inferences to be drawn from the pleadings, admissions, and affidavits, etc. against the moving party." *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 145, 642 A.2d 219 (1994).

 The statute of limitations applicable in this case is three years from the date the injury was discovered. *See* Md.Code (1974, 1998 Repl.Vol.), § 5–109(a)(2) of the Courts & Judicial Proceedings Article (C & J). Maryland follows the "discovery rule" under which "the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677 (1981). Thus, a claimant will be charged with notice, and the statute will begin to run when:

knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.

*O'Hara v. Kovens,* 305 Md. 280, 287, 503 A.2d 1313 (1986) (quoting *Poffenberger,* 290 Md. at 637, 431 A.2d 677 (alteration in original)). This aspect of limitations law is known as the discovery rule. *See Pennwalt Corp. v. Nasios,* 314 Md. 433, 438, 550 A.2d 1155 (1988). It applies in medical malpractice actions as well as other negligence suits. *See Young v. Medlantic Lab. Partnership,* 125 Md.App. 299, 725 A.2d 572, *cert. denied,* 354 Md. 572, 731 A.2d 970 (1999).

In *Conaway v. State,* 90 Md.App. 234, 600 A.2d 1133 (1992), we were called upon to apply the discovery rule in a suit for medical malpractice in a situation similar to the present one. In *Conaway,* the plaintiff, a prison inmate, alleged permanent injury to his finger caused by negligence of the prison health care provider in treating the finger when it was broken. Conaway first filed his claim in the HCAO against the State. The State alleged, *inter alia,* that Conaway "had not exhausted his administrative remedies as he did not file a claim with the Inmate Grievance Commission (IGC)." *Id.* at 238, 600 A.2d 1133. While investigating this defense, Conaway's attorney learned that the health care services provided to Conaway were not provided by state employees, but by a company with which the State contracted to provide medical care to inmates. *See id.*

As a result, Conaway amended his HCAO complaint to include the State's then current health care provider. While the litigation was pending before the HCAO, Conaway's attorney learned that the current provider was not the State's health care provider at the time medical treatment was rendered to Conaway. Rather, Frank Basil, Inc. (Basil) was under contract with the State and rendered treatment to Conaway in May 1986 when his finger was broken. Conaway amended his claim to include Basil, but both the HCAO and later the circuit court granted summary judgment in favor of Basil because the amendment was filed more than three years after discovery of the injury.

On appeal, Conaway contended "that, under the discovery rule, his claim against Basil did not accrue until December of

1989, when he learned of Basil's involvement in the case." *Id.* at 251, 600 A.2d 1133. He based his argument on the theory that knowledge of the identity of a particular defendant who caused the harm is an essential part of his cause of action, and that the cause of action should not accrue until he learns the identity of that party. *See id.* at 253, 600 A.2d 1133. In rejecting this contention, Judge Rosalyn Bell, writing for this Court, reasoned:

> Appellant was injured in May, 1986, and the allegedly negligent treatment by Basil occurred that same month. In August, 1986, appellant wrote a letter to his attorney, claiming that he had been improperly treated. In September, 1986, appellant's counsel wrote a letter to the State, requesting medical records and other information regarding appellant's treatment. We hold that appellant was aware of the circumstances surrounding his claim no later than September 8, 1986, and that he had three years from that date to bring suit against the proper parties. Appellant did not amend his complaint before the HCAO to include Basil until January, 1990, more than three years later. On that basis, we hold that appellant's claim against Basil was barred by the three-year statute of limitations set forth in § 5–109 of the Courts and Judicial Proceedings Article.

*Id.* at 252–53, 600 A.2d 1133 (footnote omitted).

The Court in *Conaway* relied in part on the Court of Appeals decision in *Ferrucci v. Jack,* 255 Md. 523, 258 A.2d 414 (1969), and summarized *Ferrucci* as follows:

> In that case, plaintiff sued a corporation which owned an apartment complex for injuries incurred while on the apartment grounds. Only after the three-year statute of limitations had run did the plaintiff discover that the corporation did not own the apartment complex at the time he incurred his injuries. Nevertheless, the Court of Appeals held that the statute of limitations barred his claim.

*Id.* at 254, 600 A.2d 1133.

The Court of Appeals in *Ferrucci* reasoned:

It scarcely need be said that ownership of the apartments could have been established by Ferrucci prior to the filing of his suit by an examination of the land records. A failure to do so is evidence of lack of the ordinary diligence required of a person seeking to toll the running of the statute.... A litigant who fails to avail himself of the provisions of our rules of procedure which allow liberal pre-trial discovery cannot be permitted to maintain that his opponent is under a duty to volunteer information which could have been gained from discovery, much less from an examination of public records.

*Ferrucci,* 255 Md. at 525, 258 A.2d 414.

The present case has significant similarities to *Conaway* and *Ferrucci*. All three cases involve: (1) the plaintiff's knowledge from an early date that he was injured, that he had a cause of action, and the nature of the cause of action; (2) the filing of suit against some party within three years of the injury; and (3) the plaintiff's belated discovery of a tortfeasor's identity.

Mr. Jacobs relies heavily on our recent decision in *Young* to support his contention that the question of limitations should be submitted to the jury. In *Young,* the plaintiff sued her gynecologist after she suffered a rupturing of the fallopian tube as a result of a failed abortion. In her suit, Ms. Young claimed that the gynecologist failed to abort the fetus and pathologically confirm that the abortion had been completed. In the course of discovery, the plaintiff obtained the laboratory's pathology report indicating that the abortion may not have been successful. The report was dated November 24, five days before the plaintiff suffered her injuries.

During the gynecologist's deposition, and more than three years from the date of her injuries, the plaintiff learned that the gynecologist did not receive the report until after she suffered her injuries. Thereafter, the plaintiff filed suit against the laboratory for failure to inform the gynecologist immediately that the report showed the abortion was not successful. The trial court dismissed the action against the

laboratory on the ground that the statute of limitations had expired. We reversed the decision of the trial court, holding that it was improper to dismiss the claim on statute of limitations grounds because reasonable minds could differ, under the circumstances presented, as to whether the plaintiff exercised due care and diligence. *See Young,* 125 Md.App. at 312, 725 A.2d 572.

In *Young,* we were disturbed by the fact that it would require far too many leaps, not compelled by logic, for the plaintiff to conclude, within the limitations period, that the laboratory's negligence in transmitting the pathology report, rather than the doctor's negligence in performing the operation, caused her injury. Judge Bloom, writing for the Court, said:

> From the fact that she had an ectopic pregnancy that was not terminated by the suction curettage, appellant had a basis to believe that she had a cause of action against Dr. Ross for failing to diagnose her condition properly and, as a result, for failing to terminate her pregnancy as he had contracted to do. Even if appellant ... had examined Dr. Ross's records much sooner than they did, they would have found appellee's written report, dated 24 November 1992, with Dr. Ross's handwritten notation that he reviewed the report on 1 December 1992. It would not have been illogical or unreasonable for appellant to assume, from the disparity between the date of the report and the date Dr. Ross read it, that appellee transmitted its report in time for Dr. Ross to have taken steps to prevent the rupture of her fallopian tube, but that Dr. Ross delayed reading it. That interpretation would have been entirely consistent with the theory already subscribed to; Dr. Ross was negligent.

*Id.* at 309–10, 725 A.2d 572. In *Young,* we distinguished *Conaway,* reasoning that in the earlier case the plaintiff knew he had been injured by substandard medical care rendered at a particular location:

> In *Conaway,* the plaintiff knew more than three years before he filed a claim against Basil that he had been

injured by the allegedly negligent medical care afforded him at the Maryland Division of Correction Brockridge facility in Jessup; he merely did not know the name of the physician who had treated him.... [Although] Ms. Young knew by 29 November 1992 of the allegedly negligent failure of Dr. Ross to successfully perform the contracted for abortion; it was not until about four years later that she discovered that appellee had allegedly committed a separate tort—breach of a distinct duty—that caused or contributed to the cause of her harm.

*Id.* at 308, 725 A.2d 572.

This case is analytically closer to *Conaway* than to *Young*. We see merit in Dr. Flynn's argument that "[d]istinct from *Young* is the fact that the medical care rendered to Mr. Jacobs by Dr. Flynn was for the purpose of diagnosing Mr. Jacobs'[s] back condition, rather than intervening as a remote pathology laboratory performing an after-the-fact analysis."

In March 1991, while Mr. Jacobs was a patient at the University of Maryland Hospital, "the comments of several doctors who attended" him caused Mr. Jacobs and his family to believe that he had not been properly cared for by his prior physicians and that "the paralysis could have been prevented." In March 1991, the first week that she heard her father had been paralyzed, Mr. Jacob's daughter, Sheila, contacted a malpractice attorney to investigate possible claims. When asked why she felt "there was a need to file a lawsuit against doctors in Maryland" she replied:

Because my father had been in the hospital approximately 10 days before he became paralyzed. And I figured, based on my interactions with the doctors or medical staff, that 10 days was an awfully long time when they did not have a clear diagnosis still about the nature of my father's discomfort and extreme pain.

Thus, it was clear that in March 1991 she perceived that her father had a cause of action relating to the substandard diagnosis and treatment of physicians at HCGH. On her lawyer's advice, she prepared a calendar of important events

relating to her father's care, and included a note on the March 2 entry that the "radiologist thinks maybe degeneration in back."

The bone scan in question was performed by employees of HCGH and interpreted by Dr. Flynn during the ten-day period she described. Dr. Flynn interpreted Mr. Jacobs's condition as normal, other than degenerative changes secondary to scoliosis. Mr. Jacobs alleged, and his expert testified at trial, that Dr. Flynn's negligent report that the scan was "normal" conveyed a message to the other physicians that "there's no reason to be concerned" about an infection.

Unlike Ms. Young, Mr. Jacobs and his family were on notice that Dr. Flynn was one of the physicians who attempted to diagnose the cause of Mr. Jacobs's back pain, and failed to detect the epidural abscess. Counsel for Mr. Jacobs had Dr. Flynn's report in his possession in early June 1991. Moreover, they knew that within five days of Dr. Flynn's interpretation of the scan, complications from the epidural abscess caused Mr. Jacobs's paralysis.

The *Young* plaintiff, in contrast, knew only that her surgery was not successful, and had no knowledge that the rupture of her fallopian tube could potentially have been avoided but for the delay of a laboratory in transmitting the pathology report to the gynecologist *after* the surgery—a highly unlikely combination of circumstances. There was nothing in the surgeon's chart pertaining to Ms. Young that would reveal that the report was delivered late, and it was only the surgeon's testimony that showed that the report dated November 24 was not delivered to the surgeon until after the November 29 rupture of her fallopian tube.

■ Mr. Jacobs argues that the limitations period was tolled in the present case because Dr. Flynn's report did not reveal his negligence, and one had to look at the actual bone scan to learn of Dr. Flynn's negligence. We do not agree. The purpose of providing a three-year period within which to bring suit is to allow persons sufficient time to investigate their claims. During that period, one has a responsibility to

perform a diligent investigation, and is charged with notice when he or she has "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry." *Poffenberger*, 290 Md. at 637, 431 A.2d 677. According to Mr. Jacobs's own expert, the negligence of Dr. Flynn is readily apparent from a review of the bone scan, which could have easily been obtained by Mr. Jacobs or his attorney in 1991.

To resolve this appeal, we must determine whether a person of ordinary prudence, investigating a malpractice claim against physicians relating to Mr. Jacobs's care at HCGH, could have failed to obtain and review the actual bone scan performed by Dr. Flynn. Given the scope of the investigation (*i.e.*, to determine which doctors contributed to the misdiagnosis), the knowledge the investigator had—that within five days of Dr. Flynn's report of "normal" results, Mr. Jacobs suffered paralysis from the epidural abscess—we conclude, as a matter of law, that a person of ordinary prudence would have obtained the bone scan. Accordingly, Mr. Jacobs is charged with knowledge of the bone scan itself, which would have disclosed Dr. Flynn's negligence. Thus, his cause of action against Dr. Flynn accrued in 1991, and the trial court properly held that his 1995 amendment adding Dr. Flynn was barred by the statute of limitations.

## III.

### Issues relating to the Maryland Uniform Contribution Among Joint Tort–Feasors Act

Several issues raised by Mr. Jacobs involve application of the Maryland Uniform Contribution Among Joint Tort–Feasors Act, found in Md.Code (1974, 1998 Repl.Vol.), § 3–1401 *et seq.* of the Courts and Judicial Proceedings Article (the "Act"). We address each one in this section.

### A.

### Effect of Seals's Settlement Agreement upon determination of joint tort-feasors

Mr. Jacobs's first contention involving the Act relates to his settlement with Dr. Seals. Mr. Jacobs contends the trial

court erred when it reduced the judgment awarded to him by the jury against Dr. MacLean from over one million dollars to $620,000. Mr. Jacobs asserts that the trial court erred in finding that there were only two tort-feasors based on the Act, and his settlement agreement with Dr. Seals. Specifically, Mr. Jacobs argues that the intentions of the parties to the release govern who is a "tort-feasor," the agreement specifies eight tort-feasors,[5] and therefore, any reduction in judgment should be based on eight tort-feasors instead of two.

At common law, a plaintiff who settled a claim with one joint tort-feasor would lose his right to sue other joint tort-feasors on the same claim. *See Loh v. Safeway Stores, Inc.*, 47 Md.App. 110, 117, 422 A.2d 16 (1980). To avoid this harsh result, a number of states, including Maryland, enacted the Uniform Contribution Among Joint Tort–Feasors Act in order to encourage settlements by allowing a plaintiff to maintain his claim against a non-settling joint tort-feasor when he settles with another joint tort-feasor and signs a release. *See id.* at 117–18, 422 A.2d 16. The Act establishes rules for how the release affects: (1) the injured person's claim against non-settling tort-feasors; and (2) the rights of contribution between settling and non-settling tort-feasors. *See* C & J §§ 3–1404 and 3–1405.

One of these rules provides:

A release by the injured person of one joint tort-feasor does not relieve the joint tort-feasor from liability to make contribution to another joint tort-feasor unless the release:

\* \* \*

(2) Provides for a reduction, to the extent of the pro rata share of the released tort-feasor, of the injured person's damages recoverable against all other tort-feasors.

C & J § 3–1405 (Effect of release on right of contribution).

Obviously, Dr. Seals sought to obtain the protection of the Act, and limit his liability by complying with section 3–1405.

---

**5.** The eight doctors mentioned in the agreement are: Drs. MacLean, Applestein, Kishel, Flynn, Sadiq, Barash, McCormack and Seals.

To this end, in addition to setting a dollar figure to be paid by Dr. Seals, the settlement agreement provided that Mr. Jacobs's claim against the remaining defendants would be reduced by at least the pro rata share of Dr. Seals for Mr. Jacobs's damages recoverable against all other tort-feasors:

> [Dr. Seals] shall be deemed to be joint tort-feasors for the purposes of [the Act], and to the extent that any joint tort-feasor is not released ... then this Release shall be deemed a joint tort-feasor release in accordance with the provisions of [the Act], and any and all of the claims against any such persons shall be reduced by the amount and the consideration paid for this Release ($199,000.00) or the amount of the Released Party's *pro rata* share of any liability, whichever is greater.

Ascertaining the number of joint tort-feasors, therefore, is critical in determining the amount by which the jury award must be reduced before judgment is entered.

The trial court found that there were two joint tort-feasors: Drs. Seals and MacLean. Accordingly, the trial judge held that Dr. MacLean was responsible for one half of the jury's award, or $620,000. Pursuant to his settlement agreement, Dr. Seals is responsible for only $199,000, an amount $420,000 less than his pro rata share of the jury verdict. As a result, Mr. Jacobs's total recovery was reduced by $420,000, and amounted to only $819,000 of the $1,240,000 jury award.

Mr. Jacobs contends that because the parties to the settlement intended eight tort-feasors for the purpose of determining pro rata shares of liability, the calculation of the credit should be based on eight tort-feasors.[6]

> The settlement agreement states, in pertinent part:
> This Release does not discharge or release of [Mr. Jacobs's] claims against [HCGH, MacLean, Kishel & Applestein, M.D., P.A., and Drs. MacLean, Kishel, Applestein, McCor-

---

6. As the number of joint tort-feasors increases, the pro rata share of each decreases. Thus, under Mr. Jacobs's theory, he would be entitled to recover a greater percentage of the jury award.

mack, and Flynn] ... and [Mr. Jacobs] intends to maintain his claims against these tort-feasors. In addition, this Release does not discharge or release any of [Mr. Jacobs's] claims against [Drs. Sadiq or Barash].

The trial court found that neither this language nor any other part of the settlement agreement identified the eight physicians as tort-feasors. We agree. This provision only provides that Mr. Jacobs does not waive his right to sue others he believes are responsible for his condition.

Furthermore, we do not see how an agreement between Mr. Jacobs and Dr. Seals can act to *increase* the liability of *other* doctors, not parties to the agreement, by purporting to designate non-contracting parties as joint tort-feasors. Joint tort-feasor status is determined by application of the Act, and an agreement could only determine joint tort-feasor status of one who was a party thereto. As the Court of Appeals said in *Martinez v. Lopez*, 300 Md. 91, 100, 476 A.2d 197 (1984): "The parties to the release cannot by their agreement restrict the benefit which the statute says flows from that release to the nonsettling defendant who is not a party to the agreement." Under the argument advanced by Mr. Jacobs, he and Dr. Seals, by designating who were tort-feasors, had the right to decide the size of the benefit flowing to the non-settling defendants under section 3–1405 of the Act. This interpretation is inconsistent with the rationale stated in *Martinez*.

## B.

### Dr. Flynn

As discussed, *supra*, the jury found in favor of Mr. Jacobs against Dr. Flynn, but the trial court subsequently directed a verdict in favor of Dr. Flynn on statute of limitations grounds, a ruling we affirm. The question remains, however, as to Dr. Flynn's status as a joint tort-feasor under the Act. Mr. Jacobs contends that the trial court should have

considered Dr. Flynn a joint tort-feasor, notwithstanding the bar of the statute of limitations, and we agree.

The Act defines joint tort-feasor as: "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." C & J § 3–1401(c). Dr. Flynn argues that the trial court was correct when it found: "In order to be considered a joint tort-feasor, a party must be found liable ... [and] judgment must be entered against a party...."

This issue is presented for the first time in Maryland, although the Court of Appeals has previously suggested, in *dictum*, that, unlike defenses based on immunity and contributory negligence, the statute of limitations does not bar a party from being considered a joint tort-feasor under the Act. *See Montgomery County v. Valk Mfg. Co.*, 317 Md. 185, 197 n. 16, 562 A.2d 1246 (1989). *In Valk*, the manufacturer of a snow plow found liable under a strict liability theory to a motorist killed in an accident with a truck using the plow, sued the truck owner for contribution. The plaintiff's direct claim against the truck owner for negligence was barred because the decedent was contributorily negligent in causing the accident.

The Court of Appeals held that, under these circumstances, the manufacturer had no claim for contribution against the truck owner because the right of contribution was predicated on the third party defendant's direct liability to the plaintiff. *See id.* at 193, 562 A.2d 1246. In explaining its decision, the Court quoted the following passage from *Prosser and Keeton on the Law of Torts*, § 50 at 339–40 (5 th ed.1984):

If there was never any liability [to the plaintiff], as where the contribution defendant has the defense of family immunity, assumption of risk, or the application of an automobile guest statute, or the substitution of workers' compensation for common law liability, then there is no liability for contribution.

*Id.* (alteration in original). The Court contrasted the liability, for contribution, of: (1) a defendant who maintained a defense

of contributory negligence; and (2) a defendant who asserted a statute of limitations defense, and explained:

> Valk argues that contributory negligence is more like a statute of limitations than immunity in terms of barring third party claims.... We disagree with Valk's comparison. Both immunity and contributory negligence arise directly out of the wrongdoing itself. By contrast, a statute of limitations defense depends on litigation procedures transpiring after the wrongdoing has occurred.

*Id.* at 197 n. 16, 562 A.2d 1246.

Cases from other jurisdictions interpreting their respective version of the Act reach the same conclusion. *See New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington,* 825 F.Supp. 1180, 1186 (D.Del.1993); *Gangemi v. National Health Lab., Inc.,* 305 N.J.Super. 97, 701 A.2d 965, 969 (App.Div. 1997); *MetroHealth Med. Ctr. v. Hoffmann–LaRoche, Inc.,* 80 Ohio St.3d 212, 685 N.E.2d 529, 533 (1997); *Oviatt v. Automated Entrance Sys. Co., Inc.,* 400 Pa.Super. 493, 583 A.2d 1223, 1227 (1990). Dr. Flynn has not cited, nor have we found, any cases barring a contribution claim based on a statute of limitations defense to the original action asserted by the one from whom contribution is sought.

The Pennsylvania Superior Court explained the rationale for this rule as follows:

> The rationale for this general rule is that otherwise an injured party could foreclose a tort-feasor's right to contribution by waiting to bring his action until just before expiration of the statute of limitations on his claim. The defendant's right of contribution, a doctrine based upon principles of fairness, could be frustrated by such a plaintiff.

*Oviatt,* 583 A.2d at 1228 n. 6 (citations omitted).

Similarly, the New York Court of Appeals, in allowing a third-party contribution action to proceed despite the expiration of the limitations period with respect to the plaintiff's direct claim against the third-party defendant, reasoned:

> The goal of contribution ... is fairness to tort-feasors who are jointly liable.... Thus, even when a particular

defendant is not directly liable to a plaintiff, due a special defense such as the Statute of Limitations, responsibility by contribution to other defendants or tort-feasors may nevertheless still adhere. Part of the reason for this seeming circuity is that the avoidance of direct liability to the injured plaintiff does not logically or legally equate to the absence of shared fault on the part of the otherwise immune defendant as among the joint tortfeasors.

*Mowczan v. Bacon,* 92 N.Y.2d 281, 284–85, 680 N.Y.S.2d 431, 433, 703 N.E.2d 242, 244 (1998).

We find the reasoning of these two cases persuasive. Accordingly, we hold that the trial court should have included Dr. Flynn as a joint tort-feasor when altering the judgment to take into account Dr. Seals's settlement agreement.

## C.

### Status of California doctors under the Act

█ Mr. Jacobs claims that Drs. Sadiq and Barash should be considered joint tort-feasors. Suit was not brought against these doctors in Maryland, presumably because Maryland courts lack jurisdiction. An action, however, has been initiated in California against Drs. Sadiq and Barash for negligence resulting in Mr. Jacobs's paraplegia. Nevertheless, Mr. Jacobs contends that their alleged negligence should be used in determining tort-feasor status for purposes of making the adjustment under the Act. We disagree.

█ As the Court of Appeals recognized long ago, "[t]he [A]ct does not specify the test of liability. Clearly, something short of an actual judgment will suffice." *Swigert v. Welk,* 213 Md. 613, 619, 133 A.2d 428 (1957). The fact, however, that a party has been sued or threatened with suit is not enough to establish joint tort-feasor status. *See Owens–Corning Fiberglas, Inc. v. Garrett,* 343 Md. 500, 531–32, 682 A.2d 1143 (1996). Tort-feasor status, in the absence of adjudication, generally rests on admission by the purported tort-feasor of such status. Thus, a party will be considered a joint

tort-feasor when it admits joint tort-feasor status in a settlement agreement, *see Martinez,* 300 Md. at 94–95, 476 A.2d 197, or if a default judgment has been entered against a party. *See Porter Hayden Co. v. Bullinger,* 350 Md. 452, 473–74, 713 A.2d 962 (1998) (because a default judgment is considered an admission of liability, it is sufficient to establish joint tort-feasor status). One will not be considered a joint tort-feasor, however, merely because he or she enters a settlement and pays money. *See Garrett,* 343 Md. at 532, 682 A.2d 1143. Where the settling parties specify in the release that the settling party shall not be considered a joint tort-feasor, monies paid on account of such settlement will be considered merely volunteer payments; a non-settling defendant judicially determined to be liable will not be entitled to a reduction of the damages awarded against it on account of the consideration paid by the settling party. *See id.* at 531–33, 682 A.2d 1143; *Collier v. Eagle-Picher Indus., Inc.,* 86 Md.App. 38, 57, 585 A.2d 256, *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991).

Mr. Jacobs asks us to hold that Drs. Sadiq and Barash are joint tort-feasors, even though they have not admitted being joint tort-feasors through a settlement agreement and there has been no judicial determination of their tort-feasor status. He offers several theories as to why the trial court erred in not finding these California doctors joint tort-feasors, none of which we find persuasive.

First, Mr. Jacobs claims these doctors should be considered joint tort-feasors because Dr. MacLean asserted and relied on the position that these doctors were tort-feasors during the trial. To the contrary, our review of the testimony reveals that Dr. MacLean did not assert that Drs. Sadiq and Barash were negligent. In fact, Dr. MacLean only pointed to these doctors to support his theory that the standard of care was not violated from his failure to detect the epidural abscess because the abscess would not have been detected in exercising the standard of care, as evidenced by eight doctors failing to identify the condition.

Second, Mr. Jacobs now contends that the trial court should have held an evidentiary hearing to determine whether the California doctors are joint tort-feasors, before entering a final judgment. This contention, however, was not made below. Indeed, Mr. Jacobs asserted to the contrary: that the liability of the California doctors could only be determined "after an evidentiary hearing on the role of other tort-feasors ... and the Act does not envision such a hearing." Under Maryland Rule 8–131, we decline to address any issue not raised or decided in the trial court. *See* Md. Rule 8–131.

Even were we to address the substance of Mr. Jacobs's contention, we would find it lacking merit because Maryland courts do not have jurisdiction over the California doctors. Without the participation of the California doctors, the results of such a hearing would not be binding upon them. *See Collier,* 86 Md.App. at 58, 585 A.2d 256 (holding when a party has "a very clear and substantial interest in those determinations ... [it has] a right to participate in that aspect of the proceedings."). Moreover, appellees would not be permitted to seek contribution against these doctors in Maryland. Mr. Jacobs retains the right to sue these California doctors in California. Upon proof of their liability, he could recover any damages determined to be due, with appropriate adjustment for any amounts paid to him in Maryland. Thus, there is no unfairness to Mr. Jacobs in our application of the Act.

Finally, Mr. Jacobs cites *Carr v. Korkow Rodeos,* 788 F.2d 485 (8 th Cir.1986), for the proposition that "where the 'pro rata share' cannot be determined on the basis of the record before the trial court and evidence of other person's fault would have to be taken, then the size of the credit will be equal to the amount of the settlement, despite any reference to 'pro rata share' in the release." *Carr,* however, is inapposite to the present case.

Unlike the present controversy, in *Carr* the joint tort-feasor status of all of the defendants was determined in the course of the trial on the merits. Applying South Dakota law, the court found that six settling defendants and three judgment defen-

dants were joint tort-feasors. South Dakota, however, is a comparative fault state, requiring "the relative fault of each of the joint tort-feasors [to] be considered." *Id.* at 488.[7] In making the statement quoted by Mr. Jacobs, the Eighth Circuit was concerned with degrees of fault, rather than status as a joint tort-feasor. *Carr* does not persuade us that the trial court should have included the California doctors as joint tort-feasors.

For all of these reasons, we conclude that the trial court did not err in declining to determine the liability of the California doctors. On remand, after further proceedings as directed in this opinion, it would be appropriate for the trial court to enter final judgment without adjustment for any liability of the California doctors.[8] *See Anchor Packing Co. v. Grimshaw,* 115 Md.App. 134, 185, 692 A.2d 5 (1997), *rev'd on other grounds sub nom.* 350 Md. 452, 713 A.2d 962 (1998) (holding that entry of final judgment was appropriate even when the joint tort-feasor status of a party was not determined when there were no remaining cross-claims).

## IV.

### The trial court erred in excluding medical records from California for rehabilitative purposes.

Mr. Jacobs next contends that the trial court erred in excluding Plaintiff's Exhibits 2 and 3. A major issue during trial was whether Mr. Jacobs effectively communicated the location of his pain as "mid-back" as opposed to lower back.

---

7. Maryland is not a comparative fault state and does not require a determination of relevant fault in determining pro rata shares. *See Franklin v. Morrison,* 350 Md. 144, 168, 711 A.2d 177 (1998) ("[A] system of comparative fault for indemnification would be inconsistent with [the Act].... Once the determination has been made that two or more parties are joint tort-feasors, [the Act] does not concern itself with the relative degrees of fault between the parties.").

8. If there were a final judgment in California rendering the California doctors liable to Mr. Jacobs, then adjustment of the Maryland judgment under the Act, taking into account the California judgment, would be appropriate.

Mr. Jacobs and his family members testified that Mr. Jacobs communicated to Drs. McCormack, Kishel, and Applestein that his pain was mid-back. Conversely, the doctors testified that Mr. Jacobs communicated to them that his pain was in his lower back.

Exhibits 2 and 3 are medical records of Mr. Jacobs's treatment in California in February of 1991 after he was discharged from the California hospital. Exhibit 2 contains the notes of visiting nurses that provided home care to Mr. Jacobs in California. Exhibit 3 contains the records of Mr. Jacobs's consultation with a physician at a clinic in California. Both records reveal that Mr. Jacobs identified his pain as mid-back. The Maryland doctors, however, never saw these documents while treating Mr. Jacobs, and Mr. Jacobs does not argue that they were used in diagnosing and treating his condition at HCGH.

### i.

### Attempts to introduce records at trial

Mr. Jacobs attempted to have Exhibits 2 and 3 admitted through various witnesses. First, Mr. Jacobs attempted to introduce Exhibits 2 and 3 during the redirect examination of Sheila Jacobs. Defense counsel objected to the introduction of these records on the grounds that there was no proffer that any of the doctors who treated Mr. Jacobs at HCGH had seen these exhibits, there was no communication between the makers of these exhibits and the doctors, and the exhibits were made at a different time and place from Mr. Jacobs's treatment at HCGH. When asked to address the issue of relevancy, Mr. Jacobs argued that the records were relevant to show what area of his back Mr. Jacobs identified to his health care providers in Maryland as the location of his pain. He also argued that the records were relevant to establish causation because they tended to show "that Mr. Jacobs had a thoracic epidural abscess or osteomyelitis going back to the California hospitalization, and it was a chronic situation." The trial judge sustained the objection at this time, but left open the

possibility of admitting this evidence if Mr. Jacobs could lay a proper foundation through other witnesses.

Next, Mr. Jacobs attempted to have the exhibits admitted through Dr. Kaufman. Defense counsel objected to the introduction of the exhibits through Dr. Kaufman because Dr. Kaufman had previously testified during depositions that he had not been provided with the California records and that Mr. Jacobs never disclosed that Dr. Kaufman was going to render an opinion based on those records. The trial court sustained the objection on the basis that appropriate disclosures had not been made during discovery. Mr. Jacobs then tried to introduce the exhibits during redirect examination of Dr. Kaufman, claiming that defense counsel raised the issue of how Mr. Jacobs described the location of his back pain when in California. The trial court disagreed and found that defense counsel only questioned Dr. Kaufman regarding the nature of the test ordered by physicians in California and that there was "[n]o reference, as I recall . . . to any reports of pain and complaints that came from California."

Mr. Jacobs next attempted to have the exhibits admitted through the testimony of Dr. Steven Jacobs, an expert witness called by the defense. Due to scheduling problems, Dr. Jacobs was called out of order and testified prior to completion of the appellant's case in chief. Mr. Jacobs argued to the trial court that he should have been allowed to cross-examine Dr. Jacobs with the exhibits. Again, the trial court sustained an objection to the admission of the evidence on relevancy grounds. The trial court found that the exhibits were not relevant because there was no evidence that the doctors at HCGH had seen Exhibits 2 or 3 when treating Mr. Jacobs.

Appellant's last effort to introduce the exhibits occurred during redirect examination of Mr. Jacobs, after he was cross-examined by the defense. At this point, Mr. Jacobs argued that the exhibits were probative regarding causation, and also admissible as a prior statement consistent with his testimony that he told the doctors at HCGH that his pain was mid-back.

## ii.

### Analysis of evidentiary rulings on records

Mr. Jacobs's argues that Exhibits 2 and 3 are relevant to show that Mr. Jacobs knew and communicated where his pain was located, and that if he told the California medical providers his pain was mid-back, then it is probable that he would say the same thing to the doctors at HCGH.[9] This argument was made and the evidence offered during appellant's testimony in his case in chief. Regarding the relevancy argument, the trial judge ruled:

Based upon the testimony that's been presented so far, I don't believe what the Plaintiff told the physicians in California, when I say physicians, the visiting nurses, the clinic in California, is relevant based on the testimony I've heard so far to the issue of causation. I also don't think it's relevant to what he told the physicians in Maryland. I don't think the fact that he told medical personnel in California something a couple days prior is relevant to what he told the physicians in Maryland.

In *Myers v. Celotex Corp.*, 88 Md.App. 442, 594 A.2d 1248 (1991), *cert. denied*, 325 Md. 249, 600 A.2d 418 (1992), we discussed what constitutes relevant evidence:

[Evidence] is relevant if it is sufficiently probative of a proposition that, if established, would have legal significance to the litigation. Evidence is relevant, therefore, if it has any tendency to make the existence of a material fact more or less probable than it would be without the evidence, and a fact is material if it is of legal consequence to the determination of the issues in the case. . . .

*Id.* at 454, 594 A.2d 1248 (citation omitted). The issue, therefore, is whether admitting Exhibits 2 or 3 in the instant matter would have had a tendency to make it more or less probable that Drs. McCormack, Kishel, and Applestein

---

**9.** Appellant's contention that records were relevant to establish causation is not pursued on appeal.

breached the standard of care owed to Mr. Jacobs and this breach was a proximate cause of Mr. Jacobs's paraplegia.

■ We think that the trial court did not err in denying admission of Exhibits 2 and 3 when they were presented through the testimony of Sheila Jacobs, Dr. Kaufman, Dr. Jacobs, or in the direct testimony of Mr. Jacobs. The information in the exhibits was communicated two weeks before Mr. Jacobs's hospitalization at HCGH. Given the distance in time and place, it was reasonable for the trial judge to conclude that evidence of the earlier communication would not tend to make it more or less probable that Mr. Jacobs communicated his pain as mid-back to the Maryland doctors. Appellant is not suggesting that the doctors at HCGH had a duty to obtain these records while Mr. Jacobs was in their care, and the evidence is uncontradicted that the records were not available to them.

■ We do find error, however, in the trial court's refusal to allow Exhibits 2 and 3 to be admitted when offered by Mr. Jacobs in rebuttal after he was cross-examined by the defense. During cross-examination, Mr. Jacobs was questioned about the location of the pain, and whether he had ever experienced lower back pain. The cross-examination included questions about his prior deposition testimony, in which he had acknowledged complaining of prior pain in his lower back. Such cross-examination raised an issue about the accuracy or integrity of his testimony that he had told the Maryland doctors his pain was mid-back. Under the circumstances at that point, his prior statements to the California health care providers about the location of his pain were admissible for rehabilitation purposes under Rule 5–616(c)(2).[10] Rule 5–616(c)(2) allows the evidence of prior consistent statements "when their having been made detracts from the impeachment." Mr.

---

10. Although appellant's specific argument for admission of Exhibits 2 and 3 referred to Rule 5–802.1(b), the clear basis of the trial court's ruling was his determination that the records did not detract from the cross-examination and impeachment of appellant. The trial court erred in concluding that the records had not become relevant following the cross-examination of appellant.

Jacobs's admission in the prior depositions that he had experienced intermittent lower back pain in the past several years suggested that he may also have complained of lower back pain to the Maryland doctors. Evidence that he had complained about mid-back pain two weeks earlier to California health care providers detracted from the impeachment because it showed that he was also experiencing mid-back pain during the relevant period.

The issue as to whether Mr. Jacobs told Drs. McCormack, Kishel and Applestein that his pain was mid-back was important to his claim against them because Dr. McCormack testified that if he knew that the pain was mid-back, he would have obtained an MRI of Mr. Jacobs's mid-back, rather than his lower back. The evidence suggests that if a mid-back MRI were obtained, the epidural abscess would have been discovered earlier, and may not have caused paralysis. The issue of whether Mr. Jacobs complained about mid-back pain or lower back pain was thus critical to the issues litigated. Accordingly, we hold that Mr. Jacobs is entitled to a new trial as to Drs. McCormack, Kishel and Applestein.

## V.

### The trial court properly instructed the jury on apparent agency.

Mr. Jacobs's case against HCGH rested on the theory that Dr. Flynn was the apparent agent of HCGH.[11] The jury found that an apparent agency relationship did not exist between Dr. Flynn and HCGH and judgment was entered in favor of HCGH. Now, Mr. Jacobs contends the trial court

---

11. After the case against Dr. Flynn was dismissed on statute of limitations grounds, the trial court allowed the jury to consider his liability for the purpose of determining whether HCGH was liable under an apparent agency theory. The jury held that Dr. Flynn was liable for Mr. Jacobs's paraplegia but was not the apparent agent of HCGH. At this point, after the jury returned a verdict against Dr. Flynn, the trial judge set aside the verdict against Dr. Flynn.

erroneously instructed the jury on apparent agency. We disagree.

The trial court instructed the jury on apparent agency as follows:

> I instruct you that the only allegation against [HCGH] in this case is that the hospital is liable to Mr. Jacobs on an apparent agency theory for the alleged negligence of Dr. Meade Flynn.... In order for you to find [HCGH] liable to Mr. Jacobs you must find that Dr. Flynn committed—or breached the standard of care in his interpretation of Mr. Jacobs'[s] bone scan, and that Dr. Flynn had the apparent authority to act as an agent of [HCGH] at that time.... The term apparent agent is a term of law. There is apparent authority under the law or apparent agency under the law and I use those terms just so you understand the terms apparent agent and apparent authority if I use them mean the same thing. There is apparent authority under the law only if [HCGH] by its words or actions cause Mr. Jacobs to believe that Dr. Flynn was an employee of [HCGH], and that this belief by Mr. Jacobs was objectively reasonable under all the circumstances and that Mr. Jacobs relied upon the existence of that relationship when deciding to submit to treatment by Dr. Flynn.

Specifically, Mr. Jacobs objected to the portion of the instruction in which the trial court instructed the jury that it must find that HCGH's actions led Mr. Jacobs to believe Dr. Flynn was its employee and that Mr. Jacobs had to rely upon the existence of that relationship when deciding to submit to treatment.[12] According to Mr. Jacobs, this instruction left the

---

12. HCGH claims that Mr. Jacobs did not adequately preserve his objection for appeal. HCGH is correct in its assertion that mere objection to a jury instruction by stating the number of the instruction objected to is insufficient to preserve the objection. *See Jones v. Federal Paper Bd. Co. Inc.*, 252 Md. 475, 490, 250 A.2d 653 (1969). Mr. Jacobs, however, not only objected to the instruction by number, but proffered his own non-pattern jury instruction to properly inform the court of the grounds for the objection. The objection was properly preserved. *See Sergeant Co. v. Pickett*, 283 Md. 284, 289–90, 388 A.2d 543 (1978).

jury with the impression that it needed to find a much closer identity between Dr. Flynn and HCGH than the law requires. Mr. Jacobs proposed instead the following non-pattern jury instruction on apparent agency:

> If you find (1) that [HCGH], by its actions or words, caused Leo Jacobs to reasonably believe that Dr. Meade Flynn and the Hospital's Radiology Department were employees or agents of the Hospital, and (2) that Leo Jacobs reasonably relied on the existence of such a relationship in consenting to care by the Radiology Department or Dr. Flynn, then [HCGH] is liable to Leo Jacobs for any negligence of Dr. Flynn toward plaintiff.

We believe that the instruction given by the trial judge adequately instructed the jury on apparent agency. Therefore, we affirm the judgment in favor of HCGH.

A trial court is given wide latitude in instructing a jury. *See Planning Research Corp. v. Elford,* 114 Md.App. 138, 143, 689 A.2d 619, *cert. denied,* 346 Md. 240, 695 A.2d 1229 (1997). In determining whether it was proper for a trial court to deny a requested jury instruction, we must determine whether: (1) the requested instruction was a correct exposition of the law; (2) that law was applicable in light of the evidence presented to the jury; and (3) the requested instruction was fairly covered by the instructions actually given. *See Wegad v. Howard St. Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123 (1992).

The Court of Appeals has endorsed the Restatement (Second) of Agency, § 267 (1958) in determining whether an apparent agency relationship exists. *See Chevron, U.S.A., Inc. v. Lesch,* 319 Md. 25, 34, 570 A.2d 840 (1990); *Mehlman v. Powell,* 281 Md. 269, 273, 378 A.2d 1121 (1977). According to the Restatement:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of

care or skill of the one appearing to be a servant or other agent as if he were such.

*Chevron,* 319 Md. at 34, 570 A.2d 840.

Further, in *Chevron,* the Court held that the plaintiff relying on an apparent agency theory must show: (1) that the plaintiff was mislead by appearances by the purported principal into believing that the purported agent was an employee; (2) this belief was objectively reasonable under all the circumstances; and (3) the plaintiff relied on the existence of that relationship in making his or her decision to entrust the purported agent. *See id.* at 34–35, 570 A.2d 840. The instruction given by the trial judge informed the jury that they must find that: "Dr. Flynn had the apparent authority to act as an agent." Later in its instruction, the court instructed the jury using the word "employee." Mr. Jacobs's testimony regarding Dr. Flynn being an apparent agent of HCGH focused on Mr. Jacobs's belief that there was an employment relationship.[13] Given the evidence introduced by Mr. Jacobs to support his agency theory, we find that the trial judge's instruction to the jury was adequate and fairly covered the instruction proposed by Mr. Jacobs. We see no error in the trial court's instruction.

**JUDGMENT AFFIRMED AS TO APPELLEES FLYNN AND HOWARD COUNTY GENERAL HOSPITAL. JUDGMENT VACATED AS TO APPELLEES APPLESTEIN, KISHEL AND MCCORMACK WITH CASE REMANDED**

---

**13.** Mr. Jacobs's testimony focused exclusively on his perception that Dr. Flynn was an employee of HCGH. On direct examination, the following colloquy occurred between Mr. Jacobs and counsel:

Q. Did your belief that the radiology department and the radiologist were part of the hospital have affect on your agreement to have the bone scan done?

A. Well surely, yes, because I know that the hospital would be very cautious in screening applicants for their employment and I was absolutely sure that all the employers there were qualified....

Additionally, in response to HCGH question of whether he would have submitted to the bone scan if he was told that Dr. Flynn was not employed by the hospital, Mr. Jacobs replied, "I thought all of the people that were there were employees of the hospital."

FOR NEW TRIAL ON LIABILITY AND DAMAGES. CASE REMANDED TO TRIAL COURT AS TO APPELLEES MACLEAN AND MACLEAN, KISHEL & APPLESTEIN, M.D., P.C. FOR APPROPRIATE ADJUSTMENT IN THE OCTOBER 31, 1997 JURY AWARD PURSUANT TO THE ACT CONSISTENT WITH THIS OPINION. COST TO BE PAID: ONE–HALF APPELLANT/CROSS–APPELLEE JACOBS, ONE–TENTH APPELLEE/CROSS–APPELLANT MACLEAN, ONE–TENTH APPELLEE FLYNN, ONE–TENTH APPELLEE MCCORMACK, ONE–TENTH APPELLEE KISHEL, AND ONE–TENTH APPELLEE APPLESTEIN.