*Maryland Department of Health v. Suzanne Best*, No. 1279, September Term 2023. Opinion by Ripken, J.

**SUFFICIENCY OF THE EVIDENCE – RETALIATION – PROTECTED OPPOSITIONAL ACTIVITY**

To support a claim of retaliation under Title VII of the Civil Rights Act of 1964 or Title 20 of the Maryland State Government Article based on protected oppositional activity, evidence must demonstrate that the protected oppositional activity was made on the basis of race or some other protected status or class. Where there was no evidence that a complainant's oppositional activity was based on race, or a protected class or status, there was insufficient evidence upon which a jury could conclude that the oppositional activity was protected under Title VII or Title 20.

**SUFFICIENCY OF THE EVIDENCE – RETALIATION – PROTECTED OPPOSITIONAL ACTIVITY**

Protected oppositional activity can be proven if a plaintiff can show that the employer understood, based on the employee's actions or the employer's response, that the employee was complaining of discriminatory conduct. Where there was no evidence that the employer had knowledge that the employee's complaint was based on race, there was insufficient evidence of protected oppositional activity.

**SUFFICIENCY OF THE EVIDENCE – RETALIATION – PROTECTED OPPOSITIONAL ACTIVITY**

Protected oppositional activity can be proven if a plaintiff can show that the employer should have understood, based on the employer's or the employee's conduct, that the employee was complaining of discriminatory conduct. Where there was no evidence that the employer should have understood the employee's complaint to be based on race, there was insufficient evidence of protected oppositional activity.

**SUFFICIENCY OF THE EVIDENCE – DISCRIMINATION – ADVERSE EMPLOYMENT ACTION**

To bring a claim for discrimination using circumstantial evidence, a plaintiff must prove: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. Under *Muldrow v. City of St. Louis, Missouri*, a plaintiff need only show "some harm" to demonstrate an adverse employment action. A transfer or reassignment can therefore form the basis for an adverse employment action. Evidence was legally sufficient to demonstrate that an involuntary transfer was an adverse employment action where it caused some harm by changing the terms and conditions of employment.

Circuit Court for Baltimore County
Case No. C-03-CV-20-004575

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1279

September Term, 2023

_____

MARYLAND DEPARTMENT OF HEALTH

v.

SUZANNE BEST

_____

Zic,
Ripken,
Getty, Joseph M.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Ripken, J.

_____

Filed:  December 30, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Suzanne Best ("Best") sued her employer, the Maryland Department of Health ("MDH") in the Circuit Court for Baltimore County, claiming retaliation and race-based discrimination under both Title VII of the Civil Rights Act of 1964 ("Title VII"), and Title 20 of the Maryland State Government Article ("Title 20"). Best alleged that she was retaliated and racially discriminated against after she made an anonymous complaint to MDH's Office of the Inspector General ("OIG") about MDH's unfair hiring practices. Best asserted that the retaliation and race-based discrimination occurred when MDH employees involuntarily transferred her from Clifton T. Perkins Hospital Home ("Perkins") to Spring Grove Hospital Center ("Spring Grove").

A trial was held on the merits. After MDH moved for judgment as a matter of law ("JMOL"), and subsequently made two renewed motions for JMOL ("RJMOL"), the circuit court denied MDH's requests, and the case was submitted to the jury. The jury found MDH liable to Best for retaliation and race-based discrimination and awarded Best damages. MDH filed a motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, for a new trial, which the circuit court denied in August of 2023. MDH filed this timely appeal.

## ISSUES PRESENTED FOR REVIEW

MDH presented the following issues for our review:[1]

---

[1] Rephrased from:

    1.    Was the evidence insufficient to support a finding that the Department's reassignment of Ms. Best constituted unlawful retaliation for her complaint about the Department's hiring practices, where the complaint did not relate to prohibited discrimination, the reassignment was not a

I.      Whether there was legally sufficient evidence, such that a reasonable juror could conclude that MDH's involuntary transfer of Best was a retaliatory action.

II.     Whether there was legally sufficient evidence, such that a reasonable juror could conclude that MDH's involuntary transfer of Best constituted race-based discrimination.

For the following reasons, we shall reverse in part and affirm in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts were elicited at trial.

### A. People and Facilities Relevant to this Lawsuit

In September of 2016, Best, a White woman, began working at Perkins as an Assistant Director of Nursing ("ADON"). Perkins differs from the other hospitals in the Maryland psychiatric hospital system, as it is the only maximum security forensic psychiatric hospital in the State. When Best started her ADON role at Perkins, the CEO was John Robison ("Robison").

Prior to working at Perkins, Robison worked at Levindale Hebrew Geriatric Center ("Levindale"). Levindale is a geriatric care facility that typically employs nursing staff from the private sector; because of the difference in services provided between Perkins and Levindale, the two facilities employ nurses who frequently have different qualifications,

demotion, and the reassignment took place more than a year and half after the complaint?

2.      Was the evidence insufficient to support a finding that the Department's reassignment of Ms. Best constituted unlawful race discrimination, where the reassignment was not a demotion, no similarly situated employee was treated more favorably than Ms. Best, and any basis for a finding of discrimination was speculative?

2

dependent upon the facility and the employer. Robison served as CEO of Perkins until the summer of 2017, when he was promoted to Chief of Hospital Administration for MDH, a position in which Robison oversaw all state-funded hospitals in Maryland. Robison left MDH in March of 2021.

Michelle Preston ("Preston") began working for MDH in late 2016. She had previously worked at Levindale. Preston was hired as Best's supervisor with the title of Director of Nursing ("DON"). This meant that the chain of command went from Best, to Preston, to Robison.

After Preston began working at Perkins, she made comments that Perkins needed higher quality employees who had worked in the private sector and indicated that she wanted to bring over nurses from Levindale. Realizing that Preston was new to government work, Best and her coworker Tammy Bailey ("Bailey"), an African American[2] woman and the only other ADON at Perkins, explained the application and hiring process at Perkins. After Best and Bailey shared this information with Preston, Preston told Best that there were three people she knew at Levindale who would be interviewing for positions at Perkins, all of whom were described as African American or Black women born in Nigeria.

## B. Conflicts Begin between Best and Preston

Upon learning of these three potential new hires, Best immediately raised concerns with Preston. Best expressed these concerns after learning that the potential new hires' experience was primarily with patients who have chronic medical problems and cognitive

---

[2] To be as respectful as possible, where a witness or party has provided language describing their own race, we have attempted to use the language that person provided.

impairment, particularly related to aging, as opposed to treating people with severe mental health diagnoses, many of whom have committed serious crimes. Best voiced concerns that the candidates lacked any forensic psychiatric nursing experience, particularly in a maximum-security facility, experience that was essential for the type of care required by Perkins' patients.

Despite having previously sat on interview panels, after noting her concerns to Preston, which was the proper reporting procedure, Best was not invited to the interview panels of any of the three candidates. Best renewed her concerns regarding the three candidates' lack of essential experience. Preston replied that all three of the candidates were going to be hired. Soon after this conversation, Best also learned that the three new hires were going to be paid more than the other nursing staff at Perkins. When Best inquired about this, Preston replied that she was advocating for the new hires to receive higher pay because they were used to getting higher pay at Levindale as those jobs were in the private sector, and that in order to get the three candidates to come to Perkins, they would need to be paid at a higher rate. After Best's conversation with Preston, both she and Bailey were required to attend diversity and cultural sensitivity training.

## C. Best's OIG Complaint: Tensions Rise between Best and Robison

In early 2017, Best made an anonymous complaint to the MDH's OIG via a telephone call concerning what Best suspected were illegal hiring practices by Robison and Preston. Best's OIG complaint was on the same grounds as her original complaint to Preston: that the new employees from Levindale were being paid more than nurses presently employed at Perkins and that they lacked the high-level expertise needed by

4

psychiatric nurses working in a maximum-security facility. In response to Best's complaint, a representative from the OIG visited Perkins and conducted an audit of Perkins' hiring practices in the spring of 2017. Best testified at trial that following the OIG audit, she understood that Preston and Robison were to stop hiring people from Levindale.

On April 24, 2017, less than one month after the OIG audit, Best was required to attend a meeting with Robison. Upon Best's arrival, Robison was seated at a table with Jazmine Rich ("Rich"), the Director of Human Resources ("HR") for Perkins. Robison informed Best that the purpose of the meeting was that he believed Best was "in over her head," that Best was not a good fit for Perkins, and that his goal and plan was to fire Best. Robison then told Best that after he and the Maryland Secretary of Health signed a letter terminating Best, Robison learned that he could not terminate her because she was not an 'at-will' employee. As such, Best could only be terminated 'for cause' through progressive discipline. Robison then told Best that he was going to terminate her through progressive discipline. Best inquired of Robison at the conclusion of the meeting if he could specifically identify his concerns in writing, which he did not do. Until this point, Best and Robison had a positive relationship. Bailey also had an identical meeting with Robison and Rich and was informed of the same intention regarding her.

Prior to this meeting, Preston, Best's supervisor had never discussed any grounds for discipline nor Robison's alleged concerns with Best's job performance. Best had never received a write-up, disciplinary measure, or even had a discussion with Preston or Robison about job performance concerns; she had received, at a minimum, satisfactory ratings on her evaluations. After the April 2017 meeting, Robison avoided interacting with Best.

5

Robison testified that he was instructed by the Deputy Secretary of Behavioral Health Administration to have no further contact with Best.

In the summer of 2017, Robison was promoted to Chief of Hospital Administration overseeing all MDH Psychiatric Hospitals. In this new role, Robison supervised all state hospital CEOs and oversaw reassignments between the facilities.[3] Preston left Perkins shortly thereafter for a position at Spring Grove. Chris Irwin ("Irwin") took Robison's place as CEO of Perkins.[4] In Preston's vacancy, under the direction of Irwin, Best filled Preston's position; she was selected to be the *acting* DON. Notably, Best did not want this role because she felt like "there was a target on her back"; the position was 'at-will,' so she could be terminated without cause. From November 2017 through December 2018, the record demonstrates that the nursing leadership at Perkins was experiencing internal conflict. Irwin held meetings with Best, Preston, Bailey, Rich, Fogan, and other nursing staff members to attempt to address the issues.

### D. Best's Reassignment

In December of 2018, Robison began emailing with Fogan and Dwain Shaw ("Shaw"),[5] the CEO of Spring Grove about reassigning Best from Perkins to Spring Grove.

---

[3] In September of 2018, Robison, along with other CEOs of MDH facilities, received a letter from the Secretary of the Maryland Department of Health delegating CEOs of all Maryland State hospitals, and Robison with appointing authority. This authority was renewed in October of 2019. The appointing authority gave Robison, Shaw, Irwin, and the other named officials the power to effectuate transfers between the facilities, and stipulated the processes that the officials must follow prior to imposing any disciplinary action.

[4] Irwin served in this role until he was replaced by Marianne Fogan ("Fogan").

[5] Shaw was MDH's designated government representative at trial.

Robison proposed exchanging Best with an ADON from Spring Grove, Adesina Abimbola ("Abimbola"), with an effective date of January 2, 2019. Both Fogan and Shaw were in favor of the exchange of Best for Abimbola. On January 10, 2019, Robison emailed Fogan and Shaw again, altering the employee exchange to instead include Best for Evangeline Okechukwu ("Okechukwu").

On January 11, 2019, the exchange had yet to occur; Best was called into Fogan's office, where she met with Fogan and Rich. Fogan handed Best a memorandum signed by Robison, informing her that she was given a "temporary re-assignment"[6] to Spring Grove, effective Monday, January 28, 2019. Best's receipt of this signed memorandum was her first contact with Robison since April of 2017. When Best asked Fogan why she was being involuntarily transferred, the only answer that Fogan could provide was "shared services."[7] No information was shared with Best on how long the involuntary transfer would last, or what was required of Best to go back to being an ADON at Perkins, despite her repeated inquiries. There was no mention of any performance issue as justification for the involuntary transfer, and Best had not been progressively disciplined as Robison previously intimated.

---

[6] MDH asserts that this was a temporary reassignment. Best asserts that this was an involuntary transfer. For the sake of consistency and viewing the evidence in the light most favorable to Best, as directed by the standard of review, we will use the term "involuntary transfer." *See Jacobs v. Flynn*, 131 Md. App. 342, 353 (2000).

[7] At that time on the organizational chart, clinical services were not encompassed under shared services, but rather, departments like information technology, HR, maintenance, and hospital police.

Best did not want to work at Spring Grove because in her view, the employees there were "less competent"; Spring Grove is a very old and not well-maintained facility; and positions at Spring Grove held less prestige than positions at Perkins. Robison approved the reassignment pursuant to his appointing authority.

Best filed an internal grievance regarding her involuntary transfer in August of 2019. Concurrently, Best filed two claims with the Equal Employment Opportunity Commission ("EEOC") complaining of acts of race-based discrimination and retaliation.[8] In October of 2020, the EEOC issued a notice informing Best of her right to sue MDH related to the two EEOC charges. In March of 2023, Best returned to Perkins as an ADON.[9] Rather than be transferred back, Best had to reapply via the State website, and ultimately was required to interview again.

### E. Procedural Posture

In December of 2020, Best filed a lawsuit against MDH, Robison, Fogan, and Shaw. In her complaint, which contained six counts, Best alleged that Robison had engineered her involuntary transfer from Perkins to Spring Grove after he tried to terminate her in April 2017. At the close of discovery, MDH moved for summary judgment. The circuit court partially granted the motion, dismissing the three individual defendants, and all but

---

[8] Resulting from a motion *in limine* filed by Best, the circuit court had issued a prior order, that any evidence about whether there was a legal assessment by the EEOC was prohibited from being introduced at trial.

[9] Best was only able to return to Perkins once Bailey retired, as this created a vacancy at Perkins.

two of the claims. The only claims that remained for trial were Best's claims of retaliation and race-based discrimination under Title VII and Title 20.

The case was tried without distinction between Title VII and Title 20. The jury was asked to decide (1) whether MDH retaliated against Best when she was involuntarily transferred from Perkins to Spring Grove; and (2) whether MDH discriminated against Best on the basis of race when she was involuntarily transferred from Perkins to Spring Grove.

A trial was held in June of 2023. At the close of Best's case in chief, MDH moved for JMOL. MDH argued that the evidence was insufficient to generate a jury question on either the retaliation or race-based discrimination claims. The circuit court reserved ruling on MDH's motion, directing MDH to present its case. At the close of its presentation of evidence, MDH moved for RJMOL. The circuit court heard arguments from both sides, and then denied MDH's motion.[10] The case was submitted to the jury. The jury found MDH liable to Best on both the retaliation claim and the race-based discrimination claim. The jury awarded Best $300,000 in damages—$288,000 for emotional distress and $12,000 for medical expenses. The circuit court entered judgment for Best in June of 2023.

MDH moved for JNOV, or in the alternative, for a new trial. In August of 2023, the circuit court denied MDH's motion. MDH noted this timely appeal of the denial of

---

[10] After MDH moved for RJMOL, Best testified as a rebuttal witness. After Best's rebuttal testimony, MDH moved for RJMOL again to preserve its motion.

JNOV.[11] We will provide and incorporate additional facts as they become relevant to the resolution of the questions presented.

## STANDARD OF REVIEW

"A party is entitled to a judgment notwithstanding the verdict (JNOV) when the evidence at the close of the case, taken in the light most favorable to the nonmoving party, does not legally support the nonmoving party's claim or defense." *Jacobs v. Flynn*, 131 Md. App. 342, 353 (2000) (citing *Bartholomee v. Casey*, 103 Md. App. 34, 51 (1994), *cert. denied*, 338 Md. 557 (1995)). In reviewing the denial of a JNOV, "[a]n appellate court performs the same task as the trial court, affirming the denial of the motion for judgment, if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question." *Steamfitters Loc. Union No. 602 v. Erie Ins. Exch.*, 469 Md. 704, 726 (2020) (internal citation and quotation marks omitted).

"In a civil case, the evidence is legally sufficient to support a finding in support of the prevailing party if, on the facts adduced at trial viewed most favorably to that party, any reasonable fact finder could find the existence of the elements of the cause of action by a preponderance of the evidence." *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md. App. 321, 329 (2012) (citing *Hoffman v. Stamper*, 385 Md. 1, 16 (2005)). "[I]f the evidence does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's

---

[11] Although MDH is appealing the circuit court's denial of JNOV or in the alternative, for a new trial, their appeal only covers the denial of JNOV. Throughout its brief, MDH relies on the sufficiency of the evidence standard associated with JNOV and makes no arguments regarding the denial of the motion for a new trial. Accordingly, we will not address the standard for a new trial.

conclusion with reasonable certainty[,]" then the denial of the JNOV was error. *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503 (2011) (internal citation and quotation marks omitted). However, "[i]f the record discloses any legally relevant and competent evidence, however slight, from which the jury could rationally find as it did, we must affirm the denial of the motion." *Jacobs*, 131 Md. App. at 353.

## DISCUSSION

### I. THE EVIDENCE WAS NOT SUFFICIENT TO SUPPORT BEST'S RETALIATION CLAIMS.

#### A. Additional Facts

In early 2019, Best emailed then-Governor Hogan and then-Secretary of Health, Neall (Robison's direct supervisor), expressing her dissatisfaction with the reassignment and requesting to be transferred out of the Behavioral Health Administration. In February of 2019, the head of MDH's HR Department, Jennifer McMahan ("McMahan") responded on behalf of then-Secretary Neall, explaining that they would not be granting Best's transfer request, and encouraged Best "to take [her] talents and abilities to this new assignment, use this opportunity to continue to learn and grow, and to impart [her] skill and knowledge to staff under [her] supervision."

When Best was temporarily reassigned to Spring Grove, she retained her ADON job classification—grade twenty-one, step twenty—and her salary. The nursing classifications at Perkins are one grade higher than all other state hospital grades and classifications; ADONs at hospitals other than Perkins, such as Spring Grove, were a grade twenty. This difference between grades is because Perkins is a maximum-security hospital

while Spring Grove is a medium-security hospital. Further, patients at Spring Grove are typically accused of misdemeanor crimes, not felonies or other violent crimes as those at Perkins.

## B. The Parties' Contentions

MDH contends that the evidence adduced at trial was legally insufficient for Best to be able to meet all three elements of a retaliation claim under *Chappell*. *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483 (1990). MDH argues that the evidence was insufficient for the jury to find that Best's complaint to Preston and her OIG complaint were protected oppositional activities because the complaints were not based on race or any other protected class.[12]

In response, Best contends that the evidence was legally sufficient to demonstrate that she met the elements required to prove a retaliation claim. Best asserts that the evidence was legally sufficient to show that her complaint to the OIG was a protected activity.[13]

---

[12] Because Best cannot meet the first element of a retaliation claim, we resolve this issue without addressing the other contentions. Had we not been able to do so, MDH avers that even if the OIG complaint was a protected activity, the evidence was legally insufficient to show that Best's involuntary transfer was an adverse employment action because she was not demoted and her pay remained the same. MDH also asserts that the evidence was insufficient to show a causal connection between Best's protected activity and her involuntary transfer, as she failed to demonstrate either theory of causal connection: because there was not enough temporal proximity between her OIG complaint and her reassignment, and because Best failed to present legally sufficient evidence of "but-for" causation.

[13] Best's other contention is that her involuntary transfer was an adverse employment action because, although she did not lose any pay, the terms and conditions of her employment substantially changed when she was involuntarily transferred from Perkins to Spring Grove. Best also asserts that the evidence was legally sufficient to demonstrate that there was a causal connection between her complaint to the OIG and her involuntary transfer via

## C. Applicable Law

### i. Background Law on Retaliation Claims

Federal law provides that it is an illegal employment practice "for an employer to discriminate against any of [its] employees . . . because [the employees have] opposed any practice made an unlawful employment practice by *this subchapter*, or because [the employees have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing *under this subchapter*." 42 U.S.C.A. § 2000e-3(a) (emphasis added). Additionally, in its section on the prohibition against retaliation, Title 20 of the Maryland State Government Article provides:

> [a]n employer may not discriminate or retaliate against any of its employees or applicants for employment, . . . because the individual has: (1) opposed any practice *prohibited by this subtitle*; or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing *under this subtitle*.

Md. Code (1984, 2021 Repl. Vol.), State Government ("SG") § 20-606(f) (emphasis added).

To make a prima facie retaliation claim under § 2000e-3(a), a plaintiff must establish that "(1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Balt.,* 648 F.3d 216, 223 (4th Cir. 2011); *see also Lockheed Martin Corp. v. Balderrama*, 227 Md. App.

---

a "but-for" theory of causation, noting that temporal proximity is not the only applicable theory to demonstrate causal connection.

13

476, 504 (2016). The Maryland statute tracks the language of § 2000e-3(a). *Chappell*, 320

Md. at 496. Moreover, Maryland case law holds that,

> [i]n the absence of legislative intent to the contrary, we read § 16(f)[14] of the state act in harmony with § 2000e–3(a) of the federal statute, and therefore construe the two provisions to fulfill the same objectives. In this regard, we may look to court decisions interpreting § 2000e–3(a).

*Id.* at 494. Thus, we may utilize the same criterion as applied under Title VII to "determine

whether a prima facie violation of the state law was established." *Id.* at 496.

### ii. *Law on Protected Activities*

Both § 2000e-3(a) and § 20-606(f) of the State Government Article of the Maryland

Code differentiate between two forms of protected activities—participation and opposition.

*Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 743 (D. Md. 2023) (referencing *EEOC*

*v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)). Section 2000e-3(a) of the

United States Code, like section 20-606(f) of the State Government Article, makes it

unlawful for an employer to discriminate against an employee either "'because [the

employee] has opposed any practice made an unlawful employment practice' under Title

VII (the opposition clause), or 'because [the employee] has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing' under

Title VII (the participation clause)." *Chappell*, 320 Md. at 494 (quoting 42 U.S.C.A.

§ 2000e–3(a)).

> The opposition and participation clauses of § 2000e–3(a) have been liberally applied by the courts to shield employees who speak out against an

---

[14] Section 16(f) of Article 49B was reorganized and recodified in 2009 at section 20-606(f) of the State Government Article of the Maryland Code. *See* 2009 Md. Laws 567. Although the statute number has changed, the text of the statute remains the same.

employer's unlawful employment practices, the obvious rationale being that without some guaranteed protection to assert equal employment rights, the ultimate purpose of the act would be severely limited.

*Id.*

Only opposition is relevant here. "[P]rotected oppositional activities may include staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities, as well as complaints about suspected violations." *Navy Fed. Credit Union*, 424 F.3d at 406 (internal citations and quotation marks omitted); *see also Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 201–02 (2013) (citing *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 276 (2009) (applying the same standard and clarifying that staging an informal protest includes complaining to one's supervisor)). All a plaintiff must show is that "he or she held a good faith, subjective, and objectively reasonable belief that the employer engaged in discriminatory conduct." *Edgewood*, 212 Md. App. at 202 (citing *Peters v. Jenney,* 327 F.3d 307, 320–21 (4th Cir. 2003)).

In sum, for an employee's complaint to be a protected activity, the complaint must concern the employer's allegedly discriminatory conduct against a protected class. *Edgewood*, 212 Md. App. at 201–02 (citing *Crawford*, 555 U.S. at 276); *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 411 (4th Cir. 2022) (holding that when an employee's complaints concerned an unlawful employment practice—tampering—and were not linked to any racial motivation or other protected class, they were not protected activities under Title VII).

### D. Analysis

15

Best contends that her complaint to Preston and then to the OIG constitutes a protected oppositional activity. For Best's complaint to be a protected oppositional activity, it must have been on the basis of race or some other protected status or class. *See Edgewood*, 212 Md. App. at 201–02. Best's complaint to Preston and the OIG can be summarized into two categories of concern: that the three new hires lacked the requisite expertise necessary to do their jobs effectively and that they were getting paid higher salaries than nurses already employed at Perkins.

The record does not contain any legally relevant and competent evidence, in the form of either records or testimony, however slight, from which the jury could rationally find by the preponderance of the evidence, that the complaint was on the basis of race or another protected class. The record lacks any text, receipt, or other documentation of the language Best used, or quoted statements, when she made the OIG complaint. As such, the jury could not look to the OIG complaint to see whether Best alleged retaliation on the basis of race. Further, the record is devoid of any other documentation from Preston or the OIG regarding her complaint regarding the three new hires.

The only documentary records provided to the jury were Best's email that she sent to then-Secretary Neall, and HR Director for MDH McMahan's response on behalf of then-Secretary Neall. In her email, Best discussed her desire to be transferred back to Perkins, her belief that her involuntary transfer was illegal, and her belief that she was in a hostile work environment; Best never suggested that any of this occurred *because of* her race. In McMahan's response, there was also nothing demonstrating that Best complained that she was retaliated against on the basis of race.

16

In her testimony, Best did not suggest that her OIG complaint was on the basis of race, or any other protected class, as required to successfully plead a retaliation claim under Title VII and Title 20. Although the three new hires were African American, there was no evidence to show that Best raised race as an issue in her complaint. For instance, on direct examination, when asked why Best made an anonymous complaint to the OIG, Best testified that the three new employees

> got hired with no experience at a registered nurse supervisor position with no prior maximum security forensic psychiatric experience and [that she] believe[d] that they were getting a higher rate of pay than several nurses and nursing staff and supervisors who had been working at Perkins for several years, [] with much more experience than what the three individuals from Levindale had.

On cross examination, Best was also asked if she mentioned race as a factor in her transfer in the letter that she sent to then-Governor Hogan, to which she replied, "I don't believe I did." The attorney for MDH questioned Best specifically on what formed the basis for her OIG complaint, asking, "[s]o, do you remember testifying [in your deposition] that specifically your complaint to the OIG was about [Preston] and her hiring people from Levindale?" to which Best replied, "[y]es, that's what I testified to."

On redirect, Best affirmed the statements that she made on direct, that she failed to mention race or any other protected class, and only discussed the three new hires' lack of expertise and their pay in her complaint. Also on redirect, Best affirmed that the text of her email to then-Governor Hogan did not refer to race. In her email Best stated, "I truly believe that due to past issues I have had with [] Robison, this transfer was retaliatory." Throughout the entirety of Best's testimony, no evidence provided to the jury indicated that Best, either

17

to Preston or in her OIG complaint, ever used the words or phrases 'race,' 'discrimination,' or 'protected class or status.'[15] Thus, there was no legally sufficient evidence upon which the jury could conclude that Best's complaint was a protected activity under Title VII or Title 20.

Best asserts that there is legally sufficient evidence, such that her complaint to the OIG was *understood by* MDH as alleging race-based discrimination which was met with race-based retaliation. In support of her contention, Best cites to *Burgess v. Bowen*, 466 F. App'x 272 (4th Cir. 2012). In *Burgess*, Burgess alleged that she suffered unlawful retaliation on the basis of race when she was terminated and again when she was denied a transfer. *Burgess*, 466 F. App'x at 278, 280. The parties contested whether Burgess had engaged in a protected activity. *Id.* at 282. Burgess contended that she engaged in two protected acts, the first, when she verbally complained up the chain of command that she and another coworker were being "targeted," and the second, when she questioned the "fairness and equality" of her coworker's termination. *Id.* In response to these complaints, Burgess's supervisor almost immediately asked to consult with the organization's legal counsel after receiving Burgess's complaint, and the subsequent discussions were regarding "EEO" issues. *Id.* Further, the evidence demonstrated that Burgess had also

---

[15] One other witness that testified at trial was Kayla Smith ("Smith"), Best's Licensed Clinical Social Worker. Smith testified as an expert, speaking to the mental health struggles that Best experienced as a result of MDH's involuntary transfer of her. Smith testified that she and Best spoke a lot about Best's work, how Best felt mistreated, and about betrayal and retaliation, especially that Best "felt she had a target on her back." However, when Smith was asked, "[Best] never mentioned her race as the basis for these things happening at work in two years, right[]," Smith replied, "[n]ot that I remember."

already raised concerns to others about racial discrimination. *Id.* at 282–83. Thus, the court in *Burgess* found that the organization understood, or at the very least should have understood, that Burgess was complaining of discriminatory conduct. *Id.* at 283. Applying the standard from *Burgess* here, there is no evidence that MDH either understood or should have understood that Best was complaining of retaliation on the basis of her race.

     i.   *There is no evidence that MDH <u>understood</u> that Best's retaliation complaint was based on race.*

An examination of the MDH employees' testimony demonstrates that there was no evidence that MDH understood Best's complaint of unlawful retaliation was race-based. Robison testified at trial that he was not aware that Preston had meetings with Bailey and Best about "a number of employees that had been coming over from Levindale." Further, Robison testified that no one told him there were concerns about the hiring practices at Perkins. Consequently, Robison could not have understood Best's complaints as race-based, if he did not know there were complaints to begin with.

Rich also testified regarding the topics of the OIG investigation and the results of that OIG investigation, none of which were related to race. Rich testified that the only topic she recalled the OIG investigators discussing with her was the three new hires' qualifications. Rich indicated that the sole outcome of the OIG investigation were changes to Perkins' hiring processes but not Perkins' hiring policies. Rich added that the changes to Perkins' hiring processes were to make sure that there was a consistent process for all interviews, not solely in nursing, and to accomplish this, they reviewed and made changes to the scoring matrix used when conducting interviews for Perkins.

19

Additionally, a review of Shaw's, Fogan's, McMahan's, and Bailey's testimony demonstrates that none of them understood Best's retaliation complaint to be on the basis of race. Shaw testified that there was no discussion of race or the 2017 OIG audit in any of the conversations surrounding the reassignment. Fogan testified that as a result of the OIG investigation, all three of the new hires were found to be qualified and that none of them were dismissed, with no discussion of race. McMahan testified that she was never aware that Best made the complaint to Preston or to the OIG about the three nurses' qualifications or that they were given higher salaries. Bailey testified that she was getting an influx of complaints from nurses "who had been there, at Perkins, for years and had to train the three that came from Levindale, who were [] making more money than them [but who] didn't have the knowledge, skills[,] or abilities to perform the job." Bailey testified that, due to these complaints, she learned of the problems with pay and inexperience; hence, she had no reason to know that Best's complaints were race-based. Bailey also testified that she was not asked any questions by the OIG investigator and was not privy to who was interviewed by the OIG investigator. As such, because no employees knew that Best's complaint to Preston or the OIG was race-based, there is no evidence that MDH understood Best's retaliation complaint to be on the basis of race.

ii. *There is no evidence that MDH <u>should have understood</u> that Best's retaliation complaint was based on race.*

Best asserts that her removal from interview panels in temporal proximity to the requirement that she attend diversity and cultural sensitivity training demonstrates that MDH should have understood that Best's opposition to an unlawful employment practice

20

was on the basis of race. While it is true that Best was taken off interview panels and was required to attend diversity and cultural sensitivity training, there is nothing to demonstrate that either of these decisions were made *because* MDH understood Best's complaint to Preston or the OIG as alleging race-based retaliation. Moreover, as MDH observes, requiring an employee to attend diversity and cultural sensitivity training is a common and lawful employment practice.

There was testimony elicited at trial regarding an email Best sent to then-Governor Hogan, in which Best referred to the EEOC complaint that she filed but made no mention of race. Even given this statement, *Burgess* remains distinguishable from the case before us for two primary reasons. First, although Best filed EEOC complaints, the jury was not permitted to consider evidence of such complaints. *See supra* note 8. Second, Best filed the initial EEOC complaint one month after she was involuntarily transferred, and the second EEOC complaint one year after she was involuntarily transferred. Not only are the EEOC complaints not the protected oppositional activity, as Best filed them after the adverse action occurred, but they also cannot serve as evidence that MDH should have understood that Best was complaining of discriminatory conduct when she complained to Preston and to the OIG because the jury was not allowed to consider evidence regarding the EEOC complaints.

Therefore, *Burgess* is distinguishable from the case before us. There is not legally sufficient evidence, even slight, such that a rational juror could conclude that MDH should have known at the time that Best complained, that she was complaining of retaliation on

21

the basis of her race. Because there was no legally sufficient evidence that Best met the first element of her retaliation claim, we will not address the other elements.

## II. THE EVIDENCE WAS SUFFICIENT TO SUPPORT BEST'S RACE-BASED DISCRIMINATION CLAIMS.

### A. Additional Facts

After starting at Spring Grove, Best met with her new supervisor, Wendy Tarbalouti ("Tarbalouti"), the Chief Nursing Officer[16] of Spring Grove. Tarbalouti informed Best that her temporary reassignment had to do with a "Nigerian conflict" at Spring Grove. Best learned that ADONs at Spring Grove, Abimbola and Okechukwu, came from two different Nigerian tribes: Abimbola came from the Yoruba tribe, while Okechukwu was from the Igbo tribe. Cultural conflicts caused Abimbola and Okechukwu to struggle to work together. The record supports the contention that Abimbola "had a stronghold across the hospital system" and the prominence of the Yoruba tribe "made it a little bit challenging for some of the ADONs to get things done because of the [] tribal loyalties to [Abimbola]."

### B. The parties' contentions

MDH contends that Best did not carry the evidentiary burden to support her race-based discrimination claim pursuant to *Coleman. Coleman v. Md. Ct. of Appeals*, 626 F.3d 187 (4th Cir. 2010). In support of this argument, MDH asserts that the evidence was insufficient to show that Best's temporary, involuntary reassignment was an adverse

---

[16] The Chief Nursing Officer is akin to the DON, as functionally, the positions require the employee to perform the same tasks and were both classified as senior program management positions. Where the positions slightly differ is in their respective grades, which meant the salaries could also differ.

22

employment action. MDH also contends that the evidence was insufficient for the jury to find that Best was treated differently from similarly situated non-White employees. MDH argues that after it demonstrated a legitimate, nondiscriminatory reason for Best's temporary reassignment, Best failed to meet the burden of persuading the jury that MDH's explanation for its reassignment of Best was merely a pretext for discrimination.

In response, Best contends that the evidence was legally sufficient to demonstrate that she meets all four elements of her race-based discrimination claim. Best asserts that the evidence was legally sufficient to show that her temporary reassignment was an adverse employment action, citing recent precedent from the Supreme Court of the United States, *Muldrow v. City of St. Louis, Missouri*, which was not yet published when MDH filed its initial brief. *See generally* 601 U.S. 346 (2024). Best also contends that she presented legally sufficient evidence such that a reasonable juror could conclude based on a preponderance of the evidence that MDH employees similarly situated to Best were treated more favorably. Best then concludes her argument with the opposite assertion of MDH: she met her burden of persuading the jury that MDH's explanation for its involuntary transfer of Best was merely a pretext for discrimination.

In its reply brief, MDH recognizes the holding of *Muldrow* in a footnote, but fails to incorporate it into its argument. Instead, MDH discontinues its argument that Best's reassignment was not an adverse employment action.

## C. Background Law on Race-Based Discrimination Claims

Under Title VII, it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

23

individual with respect to [the employee's] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C.A. § 2000e-2(a). Maryland law directly parallels the federal law. *See* SG § 20-606(a)(1). A complainant may meet the burden of establishing a prima facie case of discrimination under the federal and state statutes by presenting direct or circumstantial evidence. *Dobkin v. Univ. of Baltimore Sch. of L.*, 210 Md. App. 580, 591–92 (2013).

"Evidence is 'direct' . . . when it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Williams v. Md. Dep't of Hum. Res.*, 136 Md. App. 153, 163–64 (2000) (quoting *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir. 2000)). "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190; *see also Dobkin*, 210 Md. App. at 592–93 (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).[17]

### D. Analysis

In both its initial brief and its reply brief, MDH does not contend that Best fails to meet the first two elements of a race-based discrimination claim; hence, we will discuss them only briefly here. Best meets the first element, membership in a protected class, because she brought her discrimination claim on the basis of race. With respect to

---

[17] Though not expressly referenced by either party, both parties frame their analysis using the burden-shifting framework established in *McDonnell Douglas*.

satisfactory job performance, a plaintiff need not "show that he was a perfect or model employee. Rather, a plaintiff must only show that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). The record easily provides legally sufficient evidence from which a reasonable juror could conclude that Best performed satisfactorily, namely, her performance evaluations. In Best's performance evaluations she received either "satisfactory" or "outstanding." Robison himself testified that Best is a "tremendously bright and smart clinician." Shaw testified that Best was doing a good job, was a stellar nurse, and did excellent work. Moreover, there was testimony that Best never received progressive discipline, and no progressive discipline records were presented to the jury.

As such, we will address the third and fourth elements respectively: adverse employment action, and different treatment from similarly situated employees outside the protected class. We will also address MDH's summary contention that the evidence was insufficient to support a conclusion that Best's assignment was racially discriminatory under the *McDonnell Douglas* burden-shifting framework.

As a preliminary matter, the standard for what constitutes an adverse employment action has changed. Until April of 2024, there were two paramount cases concerning the manner in which a transfer can constitute an adverse employment action for a race-based discrimination claim under Title VII and Title 20 in Maryland: *Boone v. Goldin*, 178 F.3d 253 (4th Cir. 1999) and *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir. 2004). In April of 2024, the Supreme Court of the United States, in *Muldrow v. City of St. Louis, Missouri*, resolved a circuit split regarding the standard for when a reassignment or

25

transfer can meet element three, an adverse employment action. 601 U.S. 346, 353 (2024) (discussing the circuit split and the varying phrases in the transfer/reassignment context, such as "significant level of harm," versus "some harm."). Under *Boone* and *Booz-Allen*, a "reassignment [could] only form the basis of a valid Title VII claim if the plaintiff [could] show that the reassignment had some *significant detrimental effect*." *Boone*, 178 F.3d at 256 (emphasis added); *Booz-Allen*, 368 F.3d at 376. *Muldrow* abrogated *Boone* and *Booz-Allen*. *Muldrow*, 601 U.S. at 353. Accordingly, we apply the standard from *Muldrow*.[18]

### i. Background on Muldrow v. City of St. Louis, Missouri

In *Muldrow*, the plaintiff, Sergeant Muldrow ("Muldrow"), sued the City of St. Louis ("the City") when her employer, the St. Louis Police Department ("the

---

[18] "The filing of a lawsuit does not freeze the state of the law from the date of filing." *Md. Mil. Dep't v. Cherry*, 382 Md. 117, 129 (2004). Both the Maryland Supreme Court and the Supreme Court of the United States hold that "[i]n the overwhelming majority of cases, a judicial decision sets forth and applies the rule of law that existed both before and after the date of the decision." *State v. Daughtry*, 419 Md. 35, 77 (2011); *see also James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 535 (1991) (stating that retroactive application of judicial decisions is "overwhelmingly the norm" and is "in keeping with the traditional function of the courts to decide cases before them based on their best current understanding of the law") (plurality opinion).

> Although *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529 . . . (1991), did not produce a unified opinion for the Court, a majority of Justices agreed that a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law. In announcing the judgment of the Court, Justice Souter laid down a rule for determining the retroactive effect of a civil decision: After the case announcing any rule of federal law has 'appl[ied] that rule with respect to the litigants' before the court, no court may 'refuse to apply [that] rule . . . retroactively.'

*Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 96 (1993); *Polakoff v. Turner*, 385 Md. 467, 486–87 (2005) (applying the holding of *Harper* as to recently decided cases).

Department"), transferred her from one job to another because of her sex. *Id.* at 350. From 2008 through 2017, Muldrow worked as a plainclothes police officer in the Department's specialized Intelligence Division ("the Division"). *Id.* While in this role, Sergeant Muldrow investigated public corruption and human trafficking cases, oversaw the Gang Unit, and served as head of the Gun Crimes Unit. *Id.* Moreover, because of her position, Muldrow was deputized as a Task Force Officer with the Federal Bureau of Investigation ("FBI"); this status granted her FBI credentials, an unmarked take-home vehicle, and the authority to pursue investigations outside the City. *Id.* In 2017, a new Division Commander, Captain Michael Deeba ("Captain Deeba"), was appointed. *Id.* at 351. Despite the outgoing Division Commander's remarks—that Muldrow "was a workhorse" and that "if there was one sergeant he could count on in the Division, it was Muldrow"—Captain Deeba asked the department to transfer Muldrow, stating that a male police officer "seemed a better fit for the Division's 'very dangerous' work." *Id.*

The Department transferred Muldrow involuntarily, despite her opposition. *Id.* In her new position, although her "rank and pay remained the same [], her responsibilities, perks, and schedule did not. Instead of working with high-ranking officials on the departmental priorities lodged in the Division, Muldrow now supervised the day-to-day activities of neighborhood patrol officers[,]" which meant handling arrests, reviewing reports, managing other administrative matters, and some patrol work. *Id.* Further resulting from the involuntary transfer, Muldrow lost her FBI status, the unmarked take-home vehicle, and a regular schedule. *Id.* Prior to her involuntary transfer, Muldrow worked a "traditional Monday-through-Friday" work week, while after the involuntary transfer,

27

Muldrow's schedule changed to "a 'rotating schedule' that often involved weekend shifts." *Id.*

Muldrow brought a Title VII suit challenging the transfer, alleging that the City, in its involuntary transfer of her, discriminated against her based on sex with respect to the terms or conditions of her employment. *Id.* The City moved for summary judgment. *Id.* at 352. The district court granted the City's motion for summary judgment, pursuant to precedent which stated that "Muldrow needed to show that her transfer effected a 'significant' change in working conditions producing 'material employment disadvantage.'" *Id.* The district court held that Muldrow could not meet this heightened injury standard because she did not experience a change in her salary or rank. *Id.* The district court held that Muldrow's "loss of [] networking [opportunities] available in Intelligence was immaterial because she had not provided evidence that it had harmed her career prospects. And given her continued supervisory role, she had not suffered a significant alteration to her work responsibilities." *Id.* (internal quotations omitted). The district court also held that the changes to Muldrow's schedule appeared to be minor alterations of employment, rather than material harms. *Id.* The Court of Appeals for the Eighth Circuit affirmed. *Id.*

The Supreme Court of the United States granted *certiorari* to resolve a circuit split regarding what level of harm a plaintiff must show to prove that a transfer or a reassignment is an adverse employment action. *Id.* at 353. In resolving the circuit split, the Court clarified that "[t]o make out a Title VII discrimination claim, a transferee must show *some harm* respecting an identifiable term or condition of employment." *Id.* at 354–55 (emphasis

28

added). Vacating the judgments of the district court and the Eighth Circuit, the Court held, "[w]hat the transferee does not have to show, according to the relevant text, is that the harm incurred was 'significant.'" *Id.* at 355. The Court reasoned that adding the word 'significant' to the level of harm standard, as the district court did in Muldrow's case, or as the Fourth Circuit did in *Boone* and *Booz-Allen*, was imposing a new requirement on a Title VII claimant, "so that the law as applied demand[ed] something more . . . than the law as written." *Id.* The Court noted that "there is nothing to otherwise establish an elevated threshold of harm . . . . [a]nd that difference can make a real difference for complaining transferees. Many forced transfers leave workers worse off respecting employment terms or conditions." *Id.* The Court explained that Title VII "flatly prevents injury to individuals based on status, without distinguishing between significant and less significant harms." *Id.* at 358 (internal citation and quotation marks omitted).

According to *Muldrow*, the language of § 2000e-2(a)(1) requires only that Best show that her involuntary transfer from Perkins to Spring Grove brought about some "disadvantageous" change in an employment term or condition. *Id.* at 354 (citing *Oncale v. Sundowner Offshore Serv's, Inc.*, 523 U.S. 75, 80 (1998)). The Court clarified that the words 'discriminate against' "refer to 'differences in treatment that injure' employees." *Id.* (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 681 (2020)). "[I]n the typical transfer case, [] 'worse' treatment must pertain to . . . employment 'terms [or] conditions.'" *Id.* (quoting § 2000e-2(a)(1)). The Court also noted that "the 'terms [or] conditions' phrase . . . is not used in the narrow contractual sense; it covers more than the economic or tangible." *Id.* (internal citations omitted).

29

In *Muldrow*, the Court highlighted the changes to Muldrow's terms and conditions

of employment, narrowing in on the fact that Muldrow

> was moved from a plainclothes job in a prestigious specialized division
> giving her substantial responsibility over priority investigations and frequent
> opportunity to work with police commanders . . . to a uniformed job
> supervising one district's patrol officers, in which she was less involved in
> high-visibility matters and primarily performed administrative work.
> [Muldrow's] schedule became less regular, often requiring her to work
> weekends; and she lost her take-home car . . . . It does not matter, as the
> courts below thought (and Justice Thomas echoes), that her rank and pay
> remained the same, or that she still could advance to other jobs.

*Id.* at 359.

> ii. *The evidence was sufficient to show that Best's reassignment was an adverse employment action.*

Best's contention, that her transfer from Perkins to Spring Grove caused her some

harm by changing the terms and conditions of her employment, is strikingly alike to that

in *Muldrow.* Best met her burden by presenting legally sufficient evidence, such that a

reasonable juror could find that her transfer from Perkins to Spring Grove "left her worse

off[,]" *id.* at 359, and caused her "some harm respecting an identifiable term or condition

of employment." *Id.* at 354–55.

Regarding the changes to the conditions of Best's employment, Best demonstrated

that working in Spring Grove was not merely a unit change because Spring Grove deals

with different types of patients than Perkins. Other MDH employees, including Shaw and

Rich, testified corroborating this difference. Although Best retained her grade, step, and

pay when she was involuntarily transferred to Spring Grove, the fact that Spring Grove's

ADONs were a lower grade and step in the State compensation system demonstrates that

30

the positions were not of the same caliber, just as demonstrated in *Muldrow*. *Id.* at 359.

Further, while Spring Grove's facilities are larger—it is the largest state facility in Maryland—the hospital itself is less secure than Perkins, and it has a lower security designation than Perkins.

Another change to the conditions of Best's employment resulting from her transfer was a change to her schedule. This is also analogous to *Muldrow*. *See id.* at 359. Post-involuntary transfer to Spring Grove, Best was required to work more hours and had a different schedule at Spring Grove. Best testified that at Perkins she worked mostly Monday through Friday until 4:30 p.m. However, at Spring Grove, Best was expected to work at least one weekend a month. Although Best's weekend hours were not in addition to her regular work week, as she could trade out other days and still have two days off a week, requiring Best to work weekends was a significant schedule change. There were also occasions when Best was required to work past her shift end time to provide nursing coverage, which was never required of her at Perkins. These changes to the conditions of Best's employment occurred irrespective of the Covid-19 Pandemic.[19]

Best also presented legally sufficient evidence, such that a reasonable juror could find that there were changes to the terms of employment as a result of the involuntary

---

[19] Best discusses the change in responsibilities that occurred when she was transferred to Spring Grove during the Covid-19 Pandemic, as she was assigned to the infection control department. Despite these substantial changes to the terms and conditions of her employment, there was no evidence demonstrating whether she would have incurred this responsibility at Perkins had she not been involuntarily transferred to Spring Grove. Thus, we will not analyze the changes to the terms and conditions of Best's employment related to Covid-19—nor do we need to—as she experienced at least some harm under the standard from *Muldrow*.

transfer. An in-depth review of Best's position descriptions between the two facilities also reveals other significant differences between her stated responsibilities, who she was responsible for supervising, and her working conditions. This change too, is comparable to *Muldrow*. *Id.* at 359. While at Perkins, Best's work schedule was classified as "[p]ermanent day shift," yet while involuntarily at Spring Grove, Best's work schedule was classified as "rotating shift," and "other," which provided: "Emergency Essential, Capable of working eve/night and weekends as necessary as directed by the Chief Nursing Officer/designee. Employee may be subject to call-in and overtime based on staffing needs." Additionally, the "Essential Job Functions" and the "percentage of time and/or weight of importance," the "Level, Frequency, and Purpose of Work Contacts," and the "Working Conditions" differed between Best's job at Perkins and her job at Spring Grove.

While at Spring Grove, Best was assigned to medical psychiatric units which required different levels of care, beyond psychiatry. This was a significantly different job from her role at Perkins, and Best testified regarding this, stating: "[i]t was in a completely different role, a completely different job." Best also testified that the unit she was assigned to at Spring Grove was "like a nursing home for severely medically compromised patients, some of them in the last stages of their life." At Perkins, Best's job was to "provide trauma-informed care so that the patients [could] recover and meet their maximum level of functioning." Best went on to testify that at Perkins, she "focused on helping people recover and helping staff perform[,]" whereas, while at Spring Grove, "many of the patients' goal was not to recover but, it was their end of life."

All Best was required to show was "some injury," and that the transfer left her worse off, "but need not have left her significantly so." *Muldrow*, 601 U.S. at 359. Therefore, because Best presented legally sufficient evidence by which a reasonable juror could find that her transfer from Perkins to Spring Grove left her worse off—because it changed the terms and conditions of her employment—she demonstrated an adverse employment action.

### iii. The evidence was legally sufficient to show that similarly situated employees were treated more favorably than Best.

"Absent unusual evidence of overt animus, a plaintiff seeking to prove unlawful discrimination in employment will generally need to produce evidence of comparators, or similarly[] situated employees of a different race, color, religion, sex, or national origin who have been treated differently." *Netter v. Barnes*, 908 F.3d 932, 939 (4th Cir. 2018).[20] "Comparator evidence refers to evidence that a similarly situated individual with sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Taylor v. Giant of Md., LLC*, 423 Md. 628, 632 n. 2 (2011) (internal citations and quotation marks omitted). While there is no bright-line rule for what makes two jobs "similar" under Title VII, courts frequently

---

[20] Just as we did *supra*, we again rely on Fourth Circuit precedent. As the Supreme Court of Maryland has stated, "we recognize the dearth of our own jurisprudence on this issue, as well as our history of consulting federal precedent in the equal employment area." *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652 (2011); *see also Haas v. Lockheed Martin Corp.,* 396 Md. 469, 481 n.8, (2007) ("Title VII is the federal analog to [SG § 20-606]" and "our courts traditionally seek guidance from federal cases in interpreting Maryland's [SG § 20-606(a)(1)(i).]"). *See supra* note 14.

consider the job descriptions and responsibilities, whether the two employees were subject to the same standards and reported to the same supervisor, and whether the two employees had comparable experience and education, among other qualifications. *See Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019).

"[O]ne who alleges discrimination need not identify and reconcile every distinguishing characteristic of the comparators," *Taylor*, 423 Md. at 655, but "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). An inference of race-based discrimination can be based on a comparison to similarly situated colleagues of different races if those colleagues were treated more favorably under similar circumstances. *Booth v. Cnty. Exec.*, 186 F. Supp. 3d 479, 486 (D. Md. 2016) (citing *Lightner*, 545 F.3d at 265).

## Best is Similarly Situated to Bailey

Here, Best, a White woman, presented legally sufficient evidence such that a reasonable juror could find that she was similarly situated to Bailey, a Black woman. *C.f. Booth*, 186 F. Supp. 3d at 486 (holding that Booth failed on his prima facie discrimination claim because he did not identify the race of his comparators); *Lightner*, 545 F.3d at 265 (holding that the two officers were not comparable because the male plaintiff, as the Acting Division Commander of the Professional Standards Division, was responsible for the ethics rules, whereas the female comparator was not a member of the Professional Standards Division). There are many similarities between Best and Bailey. Bailey was the only other ADON at Perkins when Best was employed there—they held the same position and

34

reported to the same supervisor, Preston. Best and Bailey both worked their way up to the ADON position, previously holding lower-level positions in government healthcare at Perkins and other state facilities. In terms of overall tenure working for the State, at the time of trial, Best had twenty-five years of nursing experience and Bailey had thirty. Both Best and Bailey sat on interview panels for potential new hires until they were removed at the same time from this role. Neither Best nor Bailey received any progressive discipline, and neither had been placed on performance improvement plans. Neither Best nor Bailey wanted to hold the DON position as they both feared that Robison would use the position for immediate firing upon beginning this role, since it is an 'at-will' position. Of utmost importance, Bailey had the same meeting with Robison and Rich and learned that Robison was seeking to terminate her employment through progressive discipline, just as he and Rich did with Best. Consequently, there is legally sufficient evidence by which a reasonable juror could find that Best is similarly situated to Bailey.

## Best is Similarly Situated to Okechukwu

MDH asserts that Okechukwu cannot be a comparator for Best under *Swaso v. Onslow County Board of Education*, and *Spencer v. Virginia State University*, because Okechukwu and Best worked at different locations.[21] 698 F. App'x 745 (4th Cir. 2017)

---

[21] At oral argument, counsel for MDH asserted that Okechukwu could not be comparator for Best because Okechukwu and Best were not similarly situated due to not having the same supervisor. In support of this argument, MDH cited to *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992). *See also Cosby v. S.C. Prob., Parole & Pardon Serv.'s*, 93 F.4th 707 (4th Cir. 2024) (citing *Mitchell* for this proposition). However, "[a]s *Mitchell*'s progeny has long noted, plaintiffs do not need to share the same supervisor in every case, and that comparison point is not a bar to relief in a case like this one, where the comparators are otherwise similar in 'all relevant respects.'" *Cowgill v. First Data Techs., Inc.*, 41 F.4th

(per curiam); 919 F.3d 199 (4th Cir. 2019). However, *Swaso* and *Spencer* are distinct from the facts before us. In *Swaso*, the Fourth Circuit held that "Swaso failed to provide any factual enhancement regarding the alleged comparators . . . that would permit the court to reasonably infer their similarity." *Swaso*, 698 F. App'x at 749. In *Spencer*, the Fourth Circuit held that Spencer failed to demonstrate that she was similarly situated to her male colleagues because she improperly relied "on broad generalizations at a high level of abstraction." *Spencer*, 919 F.3d at 204. The Fourth Circuit highlighted that Spencer's comparators were not similarly situated to her because Spencer's comparators held "the common title of 'professor' plus some generalized responsibilities . . ." and Spencer failed to "demonstrate that the different jobs were equal in skill and responsibility." *Id.* (explaining that Spencer was a sociology professor, while the comparators she advanced were engineering professors).

*Swaso* is dissimilar because Best provided factual enhancements demonstrating how she is similarly situated to Okechukwu. *See Swaso*, 698 F. App'x at 749. While it is true that Best and Okechukwu worked in different locations (Perkins and Spring Grove, respectively), the location of an employee's work and pay are not the only factual enhancements courts can examine when determining if someone is a strong comparator. *See State Comm'n on Hum. Rels. v. Kaydon Ring & Seal, Inc.*, 149 Md. App. 666, 703

370, 382 (4th Cir. 2022) (quotation marks in original). Accordingly, it does not matter that Best and Okechukwu did not have the same supervisor, as they were similarly situated in other relevant respects. *See id.* (holding that two people advanced by the plaintiff could be comparators, and still be similarly situated, despite the fact that they had different supervisors than the plaintiff).

(2003) (holding that two employees, one White and one Black, were similarly situated when they were both probationary employees who were performing poorly). Best and Okechukwu both held the ADON title. Best and Okechukwu had similar schooling in that they both held master's degrees in the nursing profession. MDH employees testified that both Best and Okechukwu were qualified to work at Perkins which they set out as a permissible reason for the employee exchange. Moreover, an inference exists that MDH found Okechukwu, the person who exchanged locations with Best, as similarly situated to Best even prior to this lawsuit, as per the willingness to exchange them. Finally, both Best and Okechukwu were having issues getting along with coworkers at their locations. Best was a part of a series of meetings during 2018 and 2019 put forth to help improve the communication and problematic dynamics between the nursing staff at Perkins, and Okechukwu had issues getting along with employees at Spring Grove.

*Spencer* is likewise distinct from the case before us because Best and Okechukwu held the same title of ADON, unlike the more general title of "professor." *See Spencer*, 919 F.3d at 204 (noting that there are many different types of professors and that an engineering professorship requires different skills, training, and efforts than a professorship in another field, such as sociology). Because of these similarities, there is legally sufficient evidence by which a reasonable juror could conclude that Best is similarly situated to Okechukwu.

**Both Bailey and Okechukwu were Treated More Favorably than Best**

The record demonstrates that there was legally sufficient evidence by which a reasonable juror could find that Bailey and Okechukwu, both Black women, were treated more favorably than Best, a White woman. Bailey lived closer to Spring Grove than Best,

37

and even offered that she was willing to be reassigned by telling her supervisor that she wanted to be transferred to Spring Grove. Bailey was willing to be transferred to Spring Grove because she had worked there previously for nine years and was familiar with the culture. In response, her supervisor told her, "they won't let you." Bailey understood "they" to mean Robison and Fogan. It was reasonable to conclude that Bailey was treated more favorably by being allowed to remain in her position.

Likewise, there was evidence to support that Okechukwu was also treated more favorably than Best. The record demonstrates that MDH had a number of concerns regarding Okechukwu's performance, including among them: an "attendance problem[;]" a struggle to motivate the other nurses and employees that reported to her to achieve the kind of results that Spring Grove needed; and Shaw's dissatisfaction with Okechukwu due to a significant number of patient abuse allegations against her. Despite these behavioral concerns, Okechukwu was treated more favorably than Best, by receiving a pay raise and an assignment to work at Perkins, a more prestigious and safer State facility. Thus, because Best presented legally sufficient evidence to illustrate that Bailey and Okechukwu were similarly situated to her but were treated more favorably, she demonstrated different treatment from similarly situated employees outside the protected class.

> iv. *Best provided legally sufficient evidence, such that a reasonable juror could conclude that MDH's reasons for transferring Best were mere pretext for discrimination, satisfying the McDonnell Douglas burden-shifting framework.*

"[I]n cases where the evidence of discrimination is circumstantial rather than direct, Maryland courts apply the three-step burden-shifting analysis first articulated

in *McDonnell Douglas* . . . ." *Belfiore v. Merchant Link, LLC*, 236 Md. App. 32, 45 (2018) (referencing *Dobkin*, 210 Md. App. at 592–93). Under the *McDonnell Douglas* framework, once a plaintiff meets the initial burden of proving a prima facie case by a preponderance of the evidence, "[t]he burden of production then shifts to the employer to . . . provide 'some legitimate, nondiscriminatory reason' for the adverse employment action." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (quoting *McDonnell Douglas*, 410 U.S. at 802); *see also Dobkin*, 210 Md. App. at 593. If the employer meets this burden, then "the plaintiff resumes the burden of persuading the factfinder that the employer's proffered explanation is merely a pretext for discrimination." *Sharif*, 841 F.3d at 203.

### The Burden Shifted to MDH

Here, the evidence supports that Best met her initial burden of proving her prima facie case by a preponderance of the evidence, as demonstrated *supra*. The burden then shifted to MDH to provide some legitimate, nondiscriminatory reason for Best's transfer. *Sharif*, 841 F.3d at 203. MDH provided evidence to meet this burden by asserting that it involuntarily transferred Best for another reason: that there was a clinical need at Spring Grove for a stronger nurse. In support of this reason, Robison testified: "Ms. Best is a very strong clinical nurse and I immediately thought of her as a good fit. She has . . . training and background in education . . . ." Later, Robison also testified, "[w]e weren't making reassignments based on any other concerns or assessments about their performance." Further, MDH offered evidence that approximately two dozen employees were reassigned during Robison's tenure.

Shaw's testimony also supports MDH's position that it had a legitimate, nondiscriminatory reason for involuntarily transferring Best. When asked, "[w]hat role, if any, did cultural tensions play in the decision to reassign Ms. Best[,]" Shaw replied, "[n]one. It had nothing to do with that." Shaw was asked directly at trial if his decision to swap Okechukwu with Best was because of Best's race or the 2017 OIG audit. In answering both questions, Shaw replied, "[n]one." Shaw was also asked if the issues between the members of the Yoruba and Igbo tribes were the reason for the involuntary transfer. He testified that changing the ADON at Spring Grove could not fix that problem.

**Best Resumed the Burden of Demonstrating that MDH's Reasons were Pretextual**

Because MDH offered evidence to meet its burden, Best then resumed the burden of persuading the jury that MDH's proffered explanation was merely a pretext for discrimination. *See Sharif*, 841 F.3d at 203. "A discrimination plaintiff may show that the employer's stated legitimate and non-discriminatory reasons for termination are pretext for discrimination by proving 'both that the reason was false, and that discrimination was the real reason for the challenged conduct.'" *Nerenberg v. RICA of S. Md.*, 131 Md. App. 646, 674 (2000) (quoting *Jiminez v. Mary Washington Coll.,* 57 F.3d 369, 377 (4th Cir. 1995), *cert. denied,* 516 U.S. 944, (1995)); *see also Edgewood*, 212 Md. App. at 200. "Pretext might be established by showing such *weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions* in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Nerenberg*, 131 Md. App. at 675 (internal citations omitted) (emphasis added).

Best presented legally sufficient evidence, such that a reasonable juror could conclude that MDH's proffered reasons for the involuntary transfer of Best were pretextual as MDH's reasons contained weaknesses. For example, none of the MDH employees explained why Okechukwu was exchanged with Best instead of Abimbola. In addition, despite the language of the letter Best received, no MDH employee provided a length of her "temporary reassignment." Robison testified that he "had no understanding of how long the reassignment was going to last." Robison also testified that he did not produce or send any documents that stipulated the parameters of the temporary reassignment. Shaw testified that he did not know how long the transfer would last, and that it would depend on whether Best "would meet the objectives of getting things settled down." Rich testified that she had no understanding, despite being in HR, as to what clinical or "operational needs" needed to be met for Best to be able to return to Perkins.

Moreover, despite her repeated questions regarding what objectives she needed to achieve to be transferred back to Perkins, Best was not informed what those objectives were. Shaw testified that he told the Chief Nursing Officer some of those criteria, such as stability and fewer patient and family complaints; however, he never told Best of these criteria. When asked how he tracked this information, Shaw was unable to provide an answer or process, outside of reviewing "how much [his] phone [was] ringing, [and] how many complaints [he was] getting," without a reporting obligation or other method of tracking this data. Further problematic for MDH's evidence, no MDH employee provided an explanation as to the reason Best was not transferred back to Perkins or why she had to

41

reapply for her job to be able to go back to Perkins, although Best's involuntary transfer was purportedly "temporary."

In addition, there was also legally sufficient evidence such that a rational juror could find, based on the preponderance of the evidence, that inconsistencies, incoherencies, and contradictions fail to support MDH's stated nondiscriminatory reason for transferring Best. *See Nerenberg*, 131 Md. App. at 670. During trial, Best's attorney asked Robison why he did not terminate the nurses at Spring Grove and hire new nurses to meet the need. Robison answered that it "was not something [they] considered doing," because the clinical need at Spring Grove did not "warrant[] that level of discipline." Despite this testimony, the evidence showed that Robison had previously attempted to terminate Best and Bailey. A jury could conclude that this statement is inconsistent with rationale for terminating Best.

Another inconsistency in Robison's testimony was that he "had no understanding of whether or not [Best] was performing well at her position at Perkins, but [he] thought she was going to fix the problem at Spring Grove[,]" which contradicts his inability to identify the problem. Robison further testified that Best could not be transferred back to Perkins because of the "[c]linical issues that remained at Spring Grove[,]" but was then unable to identify the clinical issues. One could conclude that Robison's testimony illustrates that his "reasons" for transferring Best, the "clinical needs," were pretextual. *See Edgewood*, 212 Md. App. at 207 (holding that evidence was sufficient for jurors to conclude that an employer's justification for why its employee was managing different accounts than her usual ones was inconsistent with the employer's stated justification, and

42

thus the evidence was sufficient to permit reasonable jurors to find that the explanations were pretextual).

Further inconsistencies can be found in Shaw's testimony. Shaw testified that neither he, Fogan, nor Robison discussed Best's clinical skills, yet Best was the only ADON that could address the clinical need at Spring Grove. Moreover, even with Robison's lack of knowledge regarding the clinical reasons that required Best to be transferred to Spring Grove, Shaw testified that there were cultural issues at Spring Grove as the majority of the nursing staff had ties to the Yoruba tribe, including Shaw, while Okechukwu was from the Igbo tribe. Notwithstanding Shaw's testimony that his reason for selecting Okechukwu had nothing to do with the cultural conflicts at Spring Grove, Shaw's testimony suggests otherwise:

> [Best's Attorney]: But you knew and the whole reason you were even having this conversation about transferring was because you had issues at Spring Grove, there was a clinical need at Spring Grove that wasn't being met.
>
> [] Shaw: What I wanted was a different kind of clinical leadership, okay? Because [Okechukwu] was struggling so much and having so, so many conflicts. So, I wanted someone to come through who has a fresh set of eyes, who's not tied to any people there and could evaluate it and then make some changes.
>
> [Best's Attorney]: You said not associated with any people there?
>
> [] Shaw: Yeah, someone who's not tied into any people too close, you know, sometimes people get too friendly.

Bailey's testimony is further illustrative. When asked "[d]id you have an understanding as to what [] Shaw did to resolve the tribal issues at Spring Grove?" Bailey replied that Shaw exchanged Okechukwu and Best. Further, Shaw's testimony could be deemed inconsistent

43

in that he could not provide reasons as to why he did not transfer Best to Perkins—which he could have done as he subsequently filled Robison's position and had appointing authority—even though he reassigned a different employee who asked to be transferred, just as Best had. Based on such evidence, a reasonable juror could find, based on the preponderance of the evidence, that MDH's proffered reasons were mere pretext for discrimination. Hence, we perceive no error in the trial court's decision to deny MDH's motions for JNOV.

## CONCLUSION

In conclusion, there is no legally sufficient evidence such that a reasonable juror, based on the preponderance of the evidence, could find Best's complaint to Preston or to the OIG was based on race. Accordingly, the denial of JNOV as to Best's retaliation claim under 42 U.C.S.A. § 2000e-3(a) and SG § 20-606(f) is reversed and remanded. On remand, the trial court shall grant JNOV in favor of MDH as to the retaliation claim. However, there is legally sufficient evidence such that a reasonable juror, based on the preponderance of the evidence, could find that Best was racially discriminated against when she was involuntarily transferred under 42 U.S.C.A. § 2000e-2 and SG § 20-606(a)(1)(i). There is sufficient evidence that MDH's involuntary transfer of Best was an adverse action, that Bailey and Okechukwu were similarly situated to Best yet treated more favorably, and that Best met her burden under the *McDonnell Douglas* burden-shifting framework. Thus, we cannot say the circuit court's denial of JNOV as to Best's discrimination claim was based on legally insufficient evidence, and hence, that decision is affirmed. However, because the jury verdict sheet did not differentiate the damages per each claim, we remand for a

44

new trial as to damages against MDH. The new trial shall be limited to determination of the damages afforded to Best pursuant to her race-based discrimination claim.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED AND REMANDED IN PART AND AFFIRMED IN PART. COSTS TO BE PAID BY APPELLANT.**